**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SERGII BRATUSOV, Individually and On Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>  v.<br><br>COMSCORE, INC., BRYAN WIENER, and GREGORY A. FINK,<br><br>        Defendants. | Case No. 1:19-cv-03210-KPF<br><br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Sergii Bratusov ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes, without limitation: (1) review and analysis of regulatory filings made by ComScore, Inc. ("ComScore" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC" or the "Commission"); (2) review and analysis of press releases and media reports issued and disseminated by ComScore; (3) interviews of former employees of ComScore; and (4) review of other publicly-available information concerning ComScore.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a class action on behalf of persons and entities that purchased or otherwise acquired ComScore securities between February 28, 2019 and August 7, 2019, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("Exchange Act").

2.     ComScore purports to be an information and analytics company that measures consumer audiences and advertising across media platforms.  Contrary to Defendants' optimistic representations throughout the Class Period regarding ComScore, there was a fundamental disagreement that existed between the Company's executives and the Company's Board of Directors ("Board") regarding the strategy and direction of the Company.  Namely, ComScore's executives – in particular, Chief Executive Officer ("CEO") Bryan Wiener ("Wiener") and President Sarah Hofstetter ("Hofstetter") – sought to implement a strategy based upon the Company's growth to establish a cross-platform measurement currency for the Company.  Conversely, the Company's Board sought to implement a strategy based upon cuts and cost-control measures that the Individual Defendants believed would compromise ComScore's long-term goal to establish a cross-platform measurement currency.  Accordingly, at the time Defendants made their statements, they knew such statements lacked a reasonable basis because of this fundamental disagreement, and that such statements were thereby false and misleading.

3.     As a result of this disagreement, on March 31, 2019, the Company announced the

resignations of CEO Wiener and President Hofstetter, both of whom had been appointed to their positions less than one year prior to their resignations.  The Company also stated that it expected first quarter 2019 revenue to be between $100 million and $104 million, falling short of analysts' estimates of approximately $106 million in revenue.

4.      On this news, the Company's stock price fell $6.01 per share, or nearly 30%, to close at $14.24 per share on April 1, 2019, on unusually heavy trading volume.  The Company's stock price continued to plummet throughout the Class Period, and closed on August 12, 2019 at $1.61 per share, down from its high of more than $23 per share on February 25, 2019.

5.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

8.      Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

9.      In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

10.      Plaintiff Sergii Bratusov, as set forth in the previously-filed certification,

incorporated by reference herein, purchased ComScore securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and misleading statements and/or material omissions alleged herein.

11.     Defendant ComScore is incorporated under the laws of Delaware with its principal executive offices located in Reston, Virginia.  ComScore's common stock trades on the NASDAQ exchange under the symbol "SCOR."

12.     Defendant Bryan Wiener ("Wiener") was the CEO of the Company at all relevant times.

13.     Defendant Gregory A. Fink ("Fink") was the Chief Financial Officer ("CFO") of the Company at all relevant times.

14.     Defendants Wiener and Fink (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

15.     ComScore creates products by combining information about content and advertising consumption on digital platforms, televisions, and movie screens with demographics and other descriptive information.

16.     On September 24, 2019, the SEC issued two orders regarding ComScore's fraudulent conduct that occurred between February 2014 and February 2016: (1) Order

Instituting Cease-and-Desist Proceeding Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order in the Matter of ComScore, Inc. ("ComScore SEC Order"); and (2) Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order in the Matter of Serge Matta ("Matta") ("Matta SEC Order").  Matta served as ComScore's CEO from March 1, 2014 until August 5, 2016, after working at ComScore in various capacities for more than a decade.

17.    Within the ComScore SEC Order, the SEC summarized the Company's fraudulent conduct by stating the following:

> From February 2014 through February 2016 (the "Relevant Period") Comscore public filings materially overstated revenue by approximately $50 million as result of a fraudulent scheme and improper accounting involving the manipulation of non-monetary and monetary contracts.  Comscore's and Matta's actions enabled the company to artificially exceed its analysts' consensus revenue target in seven consecutive quarters.  In addition, from April 2014 through February 2016, Comscore and Matta made false and misleading statements about two important performance metrics.

> Comscore entered into non-monetary transactions ("NMTs") for the purpose of improperly increasing revenue recognition.  Comscore valued these NMTs, which involved the exchange of data between Comscore and a counterparty, by assessing the fair value of the data it surrendered in each transaction.  In negotiating certain of these arrangements, however, Matta included certain data that the counterparty did not ask for, want, need, or use.  In addition, in communications with internal accountants and the independent auditor regarding the NMTs, Matta and other Comscore employees made false or misleading statements about the true purpose of the agreements, the commercial substance of the transactions, and the fair value of the assets.  As a result, Comscore's revenue related to these transactions was overstated by over $34.5 million during the Relevant Period.

> Comscore also entered into certain monetary transactions that improperly increased revenue recognition.  In two instances, Matta knew that contracts he negotiated were related and linked but he misrepresented or failed to disclose the true facts to Comscore's internal accountants and its independent auditor, which had the impact of overstating revenue by approximately $12 million in 2015.  In two other instances, Matta agreed to deliver data to a counterparty by the end of a quarter and then entered into undisclosed side agreements to deliver additional data after the quarter closed.  Placing future data delivery obligations into a side agreement allowed Comscore to take the position that all data at issue had been

delivered before the current quarter closed, thereby permitting Comscore to recognize all of the revenue associated with the transaction in that quarter rather than defer some or all of the revenue to subsequent quarters.

In addition, Comscore made false or misleading disclosures regarding two important performance metrics. In 2014 and 2015, Comscore disclosed inflated customer totals that falsely conveyed a consistent increase in the number of net new customers added. In fact, the number of net new customers was declining. Comscore disclosed these overstated numbers in its periodic filings with the Commission and Matta highlighted them during earnings calls with investors. Also, in the third and fourth quarters of 2015, Comscore disclosed misstated revenue growth percentages concerning one of its flagship data analytic products. Matta described this purported revenue growth in earnings calls. In fact, the product's revenue had been declining. In both instances, Matta directed or approved incremental changes within Comscore to the methodology by which the disclosed figures were calculated without disclosing those changes to investors.

In February 2016, after receiving a tip, Comscore's Audit Committee commenced an internal investigation. On March 23, 2018, Comscore, under new management, filed its Form 10-K for the year ended December 31, 2017, which included a restatement (the "Restatement"). The Restatement provided restated and corrected financial information for the years ended December 31, 2014 and 2013. The Restatement also stated that Comscore restated certain information for the quarters ended March 31, June 30, and September 30, 2015 and adjusted information previously furnished on Form 8-K for the year ended December 31, 2015. In total, Comscore reversed approximately $50 million in revenue due to the improper conduct and accounting described herein. The Restatement also identified various material weaknesses in Comscore's internal control over financial reporting and acknowledged that prior senior management did not establish or maintain an acceptable corporate culture. Since February 29, 2016, when Comscore announced that its Audit Committee was conducting an internal investigation into potential accounting matters, Comscore has lost over 85% of its market capitalization.

Based on the foregoing and the conduct described herein below, Comscore violated Section 17(a) of the Securities Act and Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

18.     Specifically, the ComScore SEC Order described how the Company was initially

focused on meeting revenue and stock-price targets:

During the Relevant Period, Comscore's former management became increasingly focused on meeting analysts' consensus revenue targets, a factor that reasonable investors consider important to their investment decisions. In 2013, 2014, and 2015, Comscore implemented incentive compensation plans for certain executives, including Matta, that were tied, in large part, to hitting revenue and adjusted EBITDA (Earnings Before Interest, Taxes, Depreciation and

Amortization) targets. In addition, in November 2014, Comscore implemented a special market-based equity award plan that would reward certain executives, including Matta, upon the achievement of pre-established stock price targets. Thereafter, Comscore management, and Matta in particular, closely tracked Comscore's internal revenue performance versus its revenue targets. For seven consecutive quarters during the Relevant Period, the revenue derived from NMTs negotiated by or at the direction of Matta made the difference between Comscore missing or hitting its revenue targets. In total, based on the conduct described herein, Comscore overstated revenues by approximately $50 million and in amounts that were material to Comscore's reported revenues on an annual and quarterly basis.

19.    The ComScore SEC Order also described the Company's fraudulent revenue-recognition practices for non-monetary transactions:

In its NMTs, Comscore and a counterparty would negotiate and agree to exchange sets of data without any cash consideration. In theory, each party was acquiring data it could use to build or enhance its products and services without having to pay any cash. As described below, even though no cash is changing hands, accounting principles generally accepted in the United States of America ("GAAP") permit revenue recognition for NMTs as long as, among other things, the fair value of the assets subject to the exchange is determinable within reasonable limits and the transaction is expected to have a significant impact on Comscore's future cash flows, also known as having "commercial substance."

Prior to the Relevant Period, Comscore had recognized revenue for one relatively small-value NMT. During the Relevant Period, however, the frequency and internally ascribed values of Comscore's NMTs increased. The NMTs were recorded in Comscore's books and records as if Comscore had negotiated and agreed to an exchange of assets of equivalent value. The actual substance of the NMTs, however, was significantly different. Comscore's NMTs often involved data exchanges where the contracts provided for Comscore to deliver substantially more data – including historical data – than counterparties wanted or intended to use. None of the counterparties recognized revenue on the NMTs, and were generally indifferent to Matta's including substantial amounts of additional data. Comscore and Matta – facing quarter-end shortfalls to analysts' revenue targets – used the NMTs as an opportunity to increase reported revenues, primarily by including such unwanted Comscore data in the contract or making unsupported, false, or misleading statements in an effort to support the fair values attributed to the transactions.

During the Relevant Period, Matta was the primary negotiator for and/or directed Comscore to execute the following NMTs:

- Company A transaction, effective December 20, 2013, valued by Comscore at $21.2 million over a 3-year term;

- Amended Company A transaction, effective December 19, 2014, valued

by Comscore at $23.2 million over a 3-year term;

• Company B transaction, executed on June 30, 2015, valued by Comscore at $8.8 million over a 2-year term;

• Company C transaction, executed on June 26, 2015, valued by Comscore at $12 million over a 3-year term; and

• Company D transaction, executed on September 30, 2015, valued by Comscore at $11.1 million over a 3-year term.

Without the improper revenue recognized from these NMTs, Comscore would have missed quarterly analysts' consensus revenue targets each quarter beginning with the fourth quarter of 2013 and continuing through the second quarter of 2015, and would have had much larger revenue shortfalls in the third and fourth quarters of 2015.

20.     The ComScore SEC Order further described how former CEO Matta included data in the NMTs that counterparties did not ask for, want, value, or use for the purpose of inflating ComScore's reported revenues:

Comscore accounted for each NMT based on its determination of the fair value of the Comscore data provided to the counterparty. As part of the scheme, Matta increased the internally determined fair value – and thus the amount of revenue that Comscore would recognize – by including data in the NMT contracts that counterparties did not ask for, want, value, or use. Matta then misrepresented or omitted facts about the counterparties' interest in and business uses for Comscore's data in communications with internal accounting personnel and/or Comscore's independent auditor.

In Company C, for example, Matta added categories of data, including historical data, to the draft agreement. Company C initially objected to the addition of the data because it did not have a use for it, but ultimately accepted its inclusion in the agreement because, at least in part, no additional data or other consideration was being requested by Comscore in return. Matta directed Comscore to execute the agreement knowing that it included data Company C did not want or intend to use and that the unwanted data was only included by Comscore to inflate the revenue Comscore recognized from the transaction. Matta also made misrepresentations to Comscore's independent auditor about the fact that Company C wanted all of the data that Comscore had included in the agreement.

21.     The ComScore SEC Order also found that "Matta misrepresented the Company B NMT as a significant data exchange and made misrepresentations in response to concerns raised by accountants:"

In Company B, Matta not only included in the NMT data that Company B did not want or intend to use, but also misrepresented the overall substance of the transaction. While Company B intended the agreement to be an evaluation by Comscore of a sample of Company B's data, Matta drafted the agreement to appear to be a significant mutual exchange of 42 months of data. Specifically, Company B intended to give Comscore a small sample set of its data for Comscore to evaluate whether or not it could match that data to Comscore's demographic and other data. Similar to the Company C example above, Matta included significant amounts of Comscore data into the contract even though Company B did not ask for or intend to use any of the data. Company B told Matta that the data had very little value to it and, in fact, Company B never looked at the data Comscore delivered. Again, Matta directed the execution of the Company B NMT knowing that the agreement included data that Company B did not want or intend to use and that the additional data would be used to inflate the revenues recorded by Comscore. When asked later by Comscore's internal accountants and independent auditor, Matta made misrepresentations about the true nature of the agreement and Company B's interest in, and the importance Company B placed on, Comscore's data.

22.     The ComScore SEC Order stated further that the NMTs "should not have been accounted for using fair value:"

ASC 845 provides accounting guidance for nonmonetary exchanges. Under ASC 845-10-30-1 through 30-3, the accounting for nonmonetary transactions is generally based on the fair values of the assets involved. However, pursuant to ASC 845-10-30-3, nonmonetary transactions should be measured based on the recorded amount of the assets transferred (less any indicated impairment) instead of fair value if, for example, the fair value of neither the assets transferred nor received is determinable within reasonable limits or the transaction lacks commercial substance. As described in more detail below, Comscore's conclusions that the NMTs had commercial substance and that the fair values of the data assets subject to the exchanges could be determined within reasonable limits were based on unsupported, false, or misleading statements or assumptions. As a result, the NMTs should not have been accounted for using fair value. Since the data transferred had recorded amounts of zero, no revenue should have been recognized for Comscore's NMTs during the Relevant Period.

23.     Additionally, according to the ComScore SEC Order, the NMTs lacked commercial substance:

ASC 845-10-30-4 states that a nonmonetary exchange has commercial substance if the entity's future cash flows are expected to significantly change as a result of the exchange. Matta knew that to recognize revenue on any NMT, Comscore had to demonstrate that the deal had commercial substance. With respect to four of the five NMTs, Matta made and/or directed others to make false and unsupported statements to internal accounting personnel and Comscore's independent auditor regarding the integration of the counterparty's data into Comscore products and

the impact the counterparty's data was expected to have on Comscore's future cash flows. With respect to the fifth NMT, Company D, unsupported claims regarding data integration and monetization were made by a mid-level and a senior-level employee. Absent the false and unsupported representations made by Matta and others, Comscore lacked sufficient evidence to support the commercial substance of the NMTs necessary for revenue recognition under GAAP.

For example, in connection with Company B and Company C, Comscore's former management represented that its quantitative projections of future cash flows were based on direct customer statements of interest in purchasing Comscore's Cross Media products that integrated the counterparty's data. Former management, including Matta, knew those representations were not accurate. Moreover, Comscore never integrated Company C's data into Comscore's Cross Media products. In connection with Company A, Matta had, and was aware of, concerns about the quality of Company A's data, which was problematic in terms of the successful integration of that data into Comscore's products, but did not share those concerns with internal accounting personnel and Comscore's independent auditor. As previously noted, Matta also knew that Company B only committed to deliver a small set of sample data for evaluation purposes, so he knew that the projection of Comscore's future cash flows from obtaining Company B's data was based upon future data deliveries that Company B had not yet agreed to make. Nevertheless, Matta made misrepresentations to both internal accountants and Comscore's independent auditor when explaining the purported use and significance of the Company B data.

24.     The ComScore SEC Order also stated that "Comscore's analysis of whether the fair value was determinable within reasonable limits was based on a flawed valuation process that relied on unsupported assumptions and/or contrived calculations:"

Because there were neither identical previous cash sales nor any other observable market for Comscore's data, for most of the data Comscore delivered in the NMTs Comscore attributed fair value to the data assets it gave up using best estimated selling price ("BESP") pursuant to ASC 605-25-30-2. Comscore had not previously sold the same data in the same way, thus the BESP process for the NMTs involved estimating fair value based on previous cash sales of purportedly similar data.

Matta knew that the ability to determine fair value within reasonable limits was essential for justifying revenue recognition on NMTs. Beginning with the Company A contract in 2013, Matta directed which prior cash contracts and more specifically which components of prior cash contracts Comscore accounting personnel should use in order to develop a BESP. The revenue accounting team was not able to independently identify any previous comparable cash sales and therefore relied on direction from Matta, who, in addition to being a senior executive, was generally viewed as having extensive product knowledge.

The contracts Matta identified were not reasonably comparable and should not have been used to support BESP, yet Matta directed internal accountants to use them and defended their use in meetings with internal accounting personnel and Comscore's independent auditor. As more NMTs were entered into, Comscore repeatedly included the same data categories as in the Company A transaction, which by that point was viewed internally as having an established "value," and therefore the same purportedly comparable contracts were used again and again to value new NMTs.

To support a fair value using contracts that were not reasonably comparable, Comscore engaged in a flawed and unreasonable valuation process. In essence, Comscore broke the relevant data down into underlying components or data attributes and then used bits and pieces of prior cash sales, sometimes involving unsupported assumptions and/or contrived calculations, to value those components or attributes. Comscore's reliance on unsupported assumptions and/or contrived calculations to equate the value of the underlying attributes of one data category to that of a different data category was unreasonable.

In sum, based on the facts described above, Comscore improperly recognized revenue on these NMTs. In Comscore's 2017 Form 10-K, all NMT revenue and expense previously reported or disclosed between 2013 and 2015 was reversed.

25.     Additionally, the ComScore SEC Order described the Company's improper accounting of linked transactions:

From mid-2014 through early 2015, Comscore negotiated a transaction whereby Company E, among other things, would acquire a percentage of Comscore stock (the "Capital Transaction"). Matta was concerned that the transaction would dilute Comscore's earnings per share, a key measure featured in Comscore's filings with the Commission, so he negotiated for a revenue guarantee to offset any dilution. Company E agreed to guarantee Comscore a revenue stream of $20.9 million, which was to be paid to Comscore through one of Company E's wholly-owned affiliates in exchange for a discount to the fair market value of Comscore stock. The amount of the discount to fair market value that Company E received in acquiring Comscore stock virtually matched the revenue guaranteed to be paid to Comscore under the revenue guarantee.

Though Matta led the negotiation of the Capital Transaction and the revenue guarantee at the same time and with the same parties, he falsely represented to Comscore's accounting personnel and the independent auditor that the transactions were separate. As a result, Comscore improperly recognized $9.3M in revenue from the revenue guarantee in 2015. Had Comscore's internal accountants and independent auditor known the truth, Comscore would not have recognized revenue under the revenue guarantee and would have instead accounted for it as part of the Capital Transaction.

In the fourth quarter of 2015, Matta manipulated the negotiations related to a series of transactions between Comscore, Company F, and Company G

(collectively, the "Triangle Transactions") to increase Comscore's revenue. As part of the Triangle Transactions, which were all signed on December 31, 2015, Company F agreed to purchase $2.95 million of data from Comscore, Company F agreed to purchase $3.05 million of data from Company G, and Company G agreed to purchase $5.75 million of data from Company F. At the time the Triangle Transactions were being negotiated, Comscore and Company G had entered into a definitive merger agreement, which eventually closed in January 2016 and resulted in Matta having knowledge of and influence over Company G's negotiations with Company F. Matta also had side communications with Company F's CEO, with whom he had a close business relationship, in which they negotiated over the details of the Comscore/Company F transaction as well as the terms of the transactions between Company F and Company G. In particular, Matta and Company F's CEO negotiated the price Company F would pay Comscore in contemplation of the pricing of Company F's transactions with Company G. Matta then orchestrated the transactions such that Company F would pay Comscore $2.95 million by the end of the year and Company F would receive a net $2.7 million from the Company F/Company G transactions – specifically, Company G agreed to pay Company F $5.75 million prior to the effective date of the merger and Company F agreed to pay Company G $3.05 million after the effective date of the merger.

In sum, Matta's conduct in the negotiations resulted in this series of transactions being, in effect, part of a single arrangement that should have been accounted for as such. Comscore recognized $2.95 million in revenue in the fourth quarter of 2015 when, in reality, the Triangle Transactions net out to only $250,000 in favor of Comscore. Had Matta disclosed the linked nature of these contracts to accounting personnel, Comscore would have recognized no revenue in the fourth quarter of 2015, and only the net amount of $250,000 in a later period.

26.     The ComScore SEC Order also detailed the Company's use of undisclosed side agreements:

In the third quarter of 2014 and the first quarter of 2015, Comscore negotiated two contracts with Company F for the sale of historical data. In each instance, Matta entered into undisclosed side agreements with Company F whereby Matta agreed to provide data and/or services outside the terms of the written contracts. These side agreements allowed Matta to hide from internal accountants and the independent auditor future data delivery obligations, thereby permitting Comscore to recognize all revenue from the contracts in the quarter they were signed rather than having to defer some or all of the revenue to future quarters. Matta signed management representation letters provided to Comscore's independent auditor in each of those quarters falsely stating that he had no knowledge of side agreements.

In September 2014, Company F agreed to purchase eCommerce data from Comscore. Company F made it clear that it needed both historical data and ongoing monthly data updates. Matta agreed to provide the monthly updates in return for a revenue sharing provision, but on the condition that the monthly

updates not be included in the contract because Comscore's accountants had advised him that these terms would impact revenue recognition. On September 30, 2014, Comscore executed a contract to sell two years of historical data to Company F for $700,000. Subsequently, pursuant to the side agreement, Comscore delivered to Company F ten months of updated data. Without the $700,000 in revenue from this contract, Comscore would have missed its consensus revenue target for the third quarter of 2014.

Similarly, in March 2015, Company F agreed to purchase Ad Exposure data from Comscore for $500,000. Company F specified that it needed "matched" data – meaning that a third party would match Comscore's panelists to Company F's panelists. This process, however, takes time and Matta was informed by Comscore's internal accountants that revenue recognition would be deferred until the match was completed. Matta then informed Company F's CEO that he was taking the "match" language out of the written contract because it impacted revenue, but that Comscore would still deliver the matched data. Comscore then recognized $500,000 in revenue in March 2015 based on the altered contract, and subsequently delivered both matched data and four months of monthly updated data that was not provided for under the terms of the contract.

27.    The ComScore SEC Order also found that the Company made false and misleading disclosures concerning customer totals:

In 2014 and 2015, Comscore disclosed its total number of customers and net new customers added in quarterly earnings calls. Comscore also disclosed its customer total in periodic filings with the Commission. The number of net new customers added per quarter was an important performance indicator for Comscore that analysts tracked and reported on. During this time, in an effort to conceal the fact that quarterly growth in Comscore's customer total had slowed or was declining, Matta approved and implemented multiple changes to the methodology by which the quarterly customer count was calculated. These changes were neither applied retroactively nor disclosed to the public.

Initially, Matta approved the incremental lowering – over at least four quarters – of the dollar threshold pursuant to which certain then existing customers were considered Comscore customers for purpose of the disclosure. When that dollar threshold reached the point where it could not be lowered any further, Matta approved adding different categories of agency end-users to the customer count over at least three different quarters. Prior to these changes, Comscore consistently counted only the agency as its client.

Matta implemented these changes to the customer count methodology to show a consistent net increase in Comscore's total customers. For seven of the eight quarters during 2014 and 2015, Comscore's disclosed net customers added was in the 40s – creating the illusion of a smooth and steady growth in its business. In fact, had the methodology remained consistent, Comscore's customer total would have shown a decline over the two-year period and been lower by hundreds of customers. By the end of 2015, Comscore's customer count total was overstated

by more than 15%.

28.     The ComScore SEC Order further provided that the Company made false and misleading disclosures concerning Validated Campaign Essentials ("vCE") revenue:

> Validated Campaign Essentials, or vCE, was a flagship product for Comscore. vCE analyzes and measures the success of advertising campaigns in real-time. Matta emphasized Comscore's vCE revenue growth in his public statements to analysts and investors. In Comscore's quarterly earnings call for the second, third, and fourth quarters of 2015, Matta told investors that Comscore would achieve $100 million in annual vCE revenue by 2017. This optimistic picture was inconsistent with Comscore's internal reports. In reality, Comscore's vCE revenue had decreased in 2015 compared to 2014. Comscore and Matta knew that vCE revenue was declining, yet they disclosed in quarterly earnings calls that Comscore's year-over-year vCE revenue grew by 53% in the third quarter of 2015 and by 56% in the fourth quarter of 2015. These disclosures were false and misleading.
>
> In an effort to conceal the decline in Comscore's vCE revenue, Comscore manipulated which sales were classified as vCE revenue. During 2015, at Matta's direction, Comscore picked a small number of high-dollar agreements, generally involving the delivery of historical data, and directed them to be re-classified as vCE even though they did not involve the sale of an actual vCE product or service. These additions were reflected in internal documents as "On Top Additions." While characterized as vCE for the purposes of Comscore's public disclosures, the transactions underlying the "On Top Additions" were not recorded under vCE SKUs in Comscore's general ledger. Thus, Comscore's vCE revenue disclosures were inconsistent with its own books and records. In sum, the entire amount of the disclosed 53% and 56% vCE revenue growth was attributable to the selected "On Top Additions" – and not the sale of vCE products or services.

29.     Thus, according to the ComScore SEC Order, the Company materially misstated financial statements and made false and misleading disclosures:

> Based on the foregoing, revenue was materially misstated in Comscore's financial statements filed with the Commission on Form 10-K for the years ended December 31, 2013 and December 31, 2014, and on Form 10-Q for the quarters ended March 31, June 30, and September 30, 2014, and March 31, June 30, and September 30, 2015. In addition, revenue was materially misstated in Comscore's February 17, 2016 earnings release for the year ended December 31, 2015 filed on Form 8-K. Comscore also made materially false and misleading statements regarding its customer count or vCE revenue growth in its quarterly earnings calls for the quarters ended March 31, June 30, and September 30, and December 31, 2014 and March 31, June 30, and September 30, and December 31, 2015.

30.     Additionally, the ComScore SEC Order stated that the Company failed to

maintain effective internal controls over financial reporting:

> During the Relevant Period, several material weaknesses in Comscore's internal control over financial reporting contributed to the material misstatements described above. As acknowledged in its Restatement, Comscore's ineffectual corporate culture resulted in, among other material weaknesses, sales practices designed to maximize and manage the timing of revenue recognition, inadequate accountability for recording transactions in accordance with GAAP, and insufficient internal controls to limit the ability of management to exercise influence over customer count and vCE disclosures. Further, Comscore identified material weaknesses related to revenue accounting, business combinations and asset acquisitions, financial close and reporting process, and tax processes. As of the filing of its Form 10-K for the year ended December 31, 2018, Comscore had remediated the identified material weaknesses, with the exception of a material weakness in internal control over financial reporting related to revenue accounting. Comscore management has certified to the Commission that it has remediated the remaining material weakness.

31.     As a result, the ComScore SEC Order found that the Company committed the following violations: (1) "Comscore violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, which prohibit fraudulent conduct in connection with the purchase or sale of securities;" (2) "Comscore violated Section 17(a) of the Securities Act, which prohibits fraudulent conduct in the offer and sale of securities;" (3) "Comscore violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder, which require issuers of securities registered pursuant to Section 12 of the Exchange Act to file with the Commission annual, quarterly, and current reports containing such information as the Commission's rules may require and such further material information as may be necessary to make the required statements, in light of the circumstances under which they were made, not misleading;" (4) "Comscore violated Section 13(b)(2)(A) of the Exchange Act, which requires reporting companies to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect their transactions and dispositions of their assets;" and (5) "Comscore violated Section 13(b)(2)(B) of the Exchange Act, which requires reporting companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles."

32.     As a result of these findings, the SEC ordered the following: (1) "Pursuant to

Section 8A of the Securities Act and Section 21C of the Exchange Act, [the Company shall] cease and desist from committing or causing any violations and any future violations of Section 17(a) of the Securities Act and Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, 13a-11, and 13a-13 thereunder;" and (2) the Company "shall pay a civil penalty of $5,000,000 to the Securities and Exchange Commission."

33.     The Matta SEC Order made similar findings regarding ComScore's former CEO Matta.  Specifically, the Matta SEC Order stated that "Matta violated Section 17(a) of the Securities Act, Sections 10(b) and 13(b)(5) of the Exchange Act and Rules 10b-5, 13a-14, 13b2-1, and 13b2-2 thereunder, and Section 304(a) of the Sarbanes-Oxley Act, and caused Comscore's violations of Section 17(a) of the Securities Act and Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, 13a-11, and 13a-13 thereunder."  As a result, the SEC ordered that: (1) "[p]ursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, [Matta] cease and desist from committing or causing any violations and any future violations of Section 17(a) of the Securities Act, Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 13(b)(5) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13, 13a-14, 13b2-1, and 13b2-2 thereunder, and Section 304(a) of the Sarbanes-Oxley Act;" (2) "[Matta] be, and hereby is, prohibited for a period of ten years following the date of this Order from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act; and (3) "[Matta] shall, within 30 days of the entry of this Order, pay a civil money penalty in the amount of $700,000 to the Securities and Exchange Commission."

### Materially False and Misleading
### Statements Issued During the Class Period

34.     It is against this background of the Company's previous fraudulent conduct that the fraudulent conduct alleged herein arose.

35.     The Class Period begins on February 28, 2019, when ComScore announced the Company's fourth quarter and full year 2018 financial results, stating in relevant part:

**Fourth Quarter 2018 Financial Highlights**

- Total year-over-year revenue growth for the fourth quarter of 6.2% to $109.3 million.

- GAAP net loss of $27.2 million, or $(0.46) per share, compared to $71.9 million, or $(1.25) per share in the year-ago quarter.

- Adjusted EBITDA of $6.3 million, compared to an adjusted EBITDA loss of $8.1 million in the year-ago quarter.

**Full-Year 2018 Financial Highlights**

- Total year-over-year revenue growth of 3.9% to $419.5 million.

- GAAP net loss of $159.3 million, or $(2.76) per share, compared to $281.4 million, or $(4.90) per share for the prior year.

- Adjusted EBITDA of $16.4 million, compared to an adjusted EBITDA loss of $18.7 million for the prior year.

- Cash, cash equivalents and restricted cash of $50.2 million, compared to $45.1 million as of December 31, 2017.

> "***In the fourth quarter, we continued to expand our customer relationships, drive revenue growth, and improve our cost structure while investing in product development, resulting in our fourth straight quarter of positive adjusted EBITDA***," said Bryan Wiener, chief executive officer of Comscore. "***We continue to benefit from shifts in the media landscape that demand a better solution and currency for measuring media across platforms. 2018 was a meaningful step forward in the transformation of Comscore, and we are now leveraging a stronger foundation to execute into 2019 and beyond***."

36.     Also on February 28, 2019, ComScore held a conference call to discuss the Company's financial results for the fourth quarter and full year 2018.  CEO Wiener and CFO Fink participated in the call, along with President Hofstetter.  During the call, CEO Wiener stated the following:

> *The headline today is our strategy of becoming a trusted currency for planning, transacting and evaluating media cross-platforms is working.*

> comScore is uniquely positioned to help content providers and advertisers grow in a dynamic environment that's becoming less influenced by historical inertia that has characterized the measurement marketplace.

> Within this new world, our position is that of an enabler, working with our partners to unlock new ways of doing business and driving growth.  With that,

I'm excited to report that Q4 was a marquee quarter for comScore and a strong finish to a pivotal year and our path forward.

While we are not declaring victory, *we do believe today's report is yet another proof point that we're on the right track towards building a business that can deliver improved revenue growth with expanding margins over time*.  Revenue in Q4 exceed our expectations due to a strong selling quarter as well as excellent delivery on our solutions.

Here are some highlights from Q4. TV and cross-platform revenue increased more than 30% year-over-year. We believe our position as a modern and viable currency alternative will only improve as traditional TV and premium digital video converge.

We also signed landmark deals with major local TV station groups that we believe will greatly accelerate our adoption as a buying currency in 2019.  Within Ratings and Planning, revenue for our syndicated digital products was down only 1% sequentially in Q4, exceeding our goal of low single digit declines.

37.     During the February 28, 2019 conference call, Defendants also provided guidance for 2019, stating:

For 2019, we anticipate mid-single digit revenue growth, a slight improvement in gross margins over 2018 and generally flat non-GAAP operating expenses relative to 2018. We expect our adjusted EBITDA margin will expand in the second half of the year and come in at mid-single digits for the year.

38.     Analysts and investors were keenly focused upon Defendants' optimistic statements regarding the prospects of the Company's growth and ComScore's long-term strategy to establish a cross-platform measurement currency.  For example, a February 28, 2019 Equity Research report from William Blair stated the following:

**Strong Growth in TV and Activation; No Change to 2019 Guidance**

ComScore reported stronger-than-expected fourth-quarter results.  Syndicated digital solutions (i.e., Media Metrix) are still weak (down 13% year-over-year), but the sequential decline in that business moderated to 1% and it was more than made up for by the strength in the rest of the business.  Excluding the syndicated digital products, revenue grew 20% (versus low double digits during the prior few quarters) due to strength in TV measurement and activation solutions. Management noted that there was $2 million of one-time revenue (16% growth excluding that factor), and the company benefited from improved delivery of products in its activation suite of products (particularly relative to the year-ago period when restructuring actions created some disruptions), so it would not extrapolate this pace of growth in the short term.  Still, comScore has announced a lot of new contract wins in TV measurement during the last few months,

management is optimistic about new products such as Comscore Campaign Ratings, and the company is gaining some traction with their activation solutions. ***These results are thus an encouraging sign about growth***.

ComScore also continues to make progress on improving its margins. Expenses were in line with our model, so the better-than-expected revenue flowed into profits. Adjusted EBITDA were positive for the fourth straight quarter, and the adjusted EBITDA margin reached 6%. Operating cash flow was modestly positive for the second consecutive quarter as well.

***Management provided 2019 guidance that was consistent with what it articulated at its investor day in November (midsingle-digit revenue growth and a midsingle-digit EBITDA margin)***. Management's 2019 guidance is back-end loaded though; for the first quarter, management expects revenue to be down slightly year-over-year, the EBITDA margin to be in the low single digits (similar to the prior year), and for operating cash flow to be slightly negative. We believe management's guidance implies that the company exits the year with high-single-digit revenue growth and high-single-digit EBITDA margins. While the company did not provide a specific update, we note that it guided at its investor day for double-digit revenue growth in 2020 and 2021, with the EBITDA margin reaching the high teens by 2021. Our model assumes 5% revenue growth in 2019 and 7% growth in 2020.

\* \* \*

Shares trade for 3.2 times revenue, compared with 2.6 times for Nielsen (NLSN $26.20; Outperform). ComScore's non-Media Metrix products are growing well; ***comScore has a variety of initiatives/new products in progress that could help sustain/accelerate growth***; and even small market share gains from Nielsen can move the needle significantly. We remain a little concerned though about the ongoing weakness in Media Metrix and the expectations for accelerating growth and margin improvement in late 2019 and 2020. We also view changes in the media world as creating both challenges (client consolidation, pressure on legacy TV clients) and opportunities (see comments above). Overall, we are somewhat encouraged by these results, but we are sticking with a Market Perform rating.

39.     Similarly, a March 1, 2019 Equity Research Report from Jefferies entitled "4Q18

Results: Strong Qtr, Trajectory Back to Profitability Taking Shape" stated the following:

Key Takeaway
***The trajectory back to profitability is beginning to take shape as results beat expectations for a 2nd consecutive quarter. 2019 guidance of mid-single-digit revenue growth was reiterated and will prove to be conservative if the level of execution seen this quarter continues. Ongoing announcements about local TV measurement wins and the ahead-of-schedule announcement of the first sell-side partner offering CCR commercially are all positive long-term indicators.***

Strong topline beat flows through to adjusted EBITDA

Revenues increased +6.2% y/y and were notably better than our +1.3% estimate ($109.3M vs. $104.3M est.). Included within this figure is $2M in one-time implementation revenues associated with the delivery of a cross-platform product in Europe, excluding which, revenues still grew a healthy 4.2%. Adjusted EBITDA of $6.3M was positive for a fourth straight quarter and well ahead of guidance, which had it slightly above breakeven.

Losses remain elevated but continue y/y improvement as expenses are kept in check GAAP EPS totaled -$0.46/ share vs. our -$0.56/share estimate as one-time expenses were lower than anticipated ($7.6M vs. $10.0M est.). Excluding such items, expenses were still better than our estimate ($125.2M vs. $127.0M est.) despite the revenue beat. Management appears intent on holding the line on expenses and guided to 2019 non- GAAP operating expenses being relatively flat y/y.

2019 guidance reiterated, revenue growth may prove to be conservative
***Mgmt. reiterated its guidance figures introduced at Investor Day (Nov 2018), including expectations of mid-single digit revenue growth in 2019***. We believe this could prove conservative if the improvements being seen in the syndicated digital product (old Digital Audience segment) continue in 2019. Revenue declines in this product offering were limited to roughly -1% q/q this past quarter. The expectation for 2019 has been for y/y declines to continue but significantly moderate. ***Meanwhile, the TV and Cross- Platform offering remains strong, growing over 30% y/y (over 20% when adjusting for the accounting change). As newer products in this line-up get introduced in 2019, revenue growth will likely accelerate***.

40.     A March 4, 2019 Aegis Capital Corp. report entitled "Great Execution; Positive Momentum Into 2019 Raising PT to $30" also stated the following:

SCOR reported revenue and Adj. EBITDA well above our estimates and that of the consensus due to strength in the TV products, activation, and custom marketing solutions, with Syndicated Digital revenue continuing to partially offset the strength.  However, Digital is seeing signs of sequential stabilization. Revenue growth accelerated to 6% from 2.5% in 3Q, but ex-Syndicated Digital, total revenue grew 20% YoY.  This is the second consecutive quarter that SCOR has outperformed our estimates on revenue and Adj. EBITDA.  SCOR maintained 2019 revenue guidance of mid-single digit growth and Adj. EBITDA margin in the mid-single digits.  Importantly, SCOR announced that CNN is the first beta tester of the comScore Campaign Ratings (CCR) product to offer CCR commercially to its advertisers.  Investors had been looking for validation that the market would adopt SCOR's new products, so this is material positive. ***The CNN conversion, in addition to several recent meaningful and incremental wins . . . points to the continued momentum towards comScore becoming a trusted currency in the market***.  SCOR also noted that they are on track to launch the buyside beta of CCR in 2Q, and reiterated that they expect to generate "significant revenue" starting in 2020 from the products.

41.     A March 4, 2019 Oppenheimer Equity Research Report entitled "Reinstating Outperform With a $28 Target on Cross-Media Video/OTT Measurement Play" similarly stated the following:

> We are moving SCOR from Not Rated to Outperform with a $28 price target based on three reasons: 1) stabilizing legacy Syndicated Digital business (MediaMetrix), 2) acceleration in TV/OTT businesses with forthcoming catalysts (launching beta DSP product in 2Q) and 3) material strategic value with attractive sum-of-the parts valuation. ***SCOR has shifted its focus away from mobile web and apps, operating as a duopoly to compete for video measurement against NLSN***. Within video measurement, there are very high barriers to entry, specifically around MRC accreditation and ecosystem integration. Our $28 target assumes 5x 2020E revenue from the growth business within Ratings and Planning, while assuming 3x 2020E revenue for the remaining businesses: Syndicated Digital Revenue (legacy MediaMetrix business), Analytics and Optimization, and Movies Reporting and Analytics.

42.     A March 4, 2019 SunTrust Robinson Humphrey ("SunTrust") report entitled "Reinstating Coverage With Buy Rating, $27 Price Target, Thesis Underpinned By Survey and Analysis of Recent Client Wins" further stated the following:

> **REINSTATING COVERAGE OF SCOR WITH BUY RATING.** Our Buy thesis is predicated on the belief that SCOR enters 2019 with renewed organizational momentum and that 2019 consensus expectations are likely to prove conservative. Our thesis is underpinned by recent proprietary survey-work and analysis of recent client wins/announcements.
>
> 1. **Renewed Organizational Momentum.** From early 2016 through mid-2018, SCOR was severely disrupted by an accounting re-audit and investigation that caused significant C-level and Board turnover and weighed on execution, innovation, and morale. Despite this, the company was able to grow revenue modestly in 2017 with some acceleration in 2018. ***With a new CEO, President, and strategy firmly in place, we believe prospects are brighter looking forward***.

43.     The statements that Defendants made in ¶¶35-37 were false and misleading. Contrary to Defendants' representations that the Company was focused on "driv[ing] revenue growth," that ComScore's "strategy of becoming a trusted currency for planning, transacting and evaluating media cross-platforms" was "working," and that the Company was "on the right track towards building a business that can deliver improved revenue growth with expanding margins over time," there was a fundamental disagreement that existed at the time between ComScore's executives and the Company's Board regarding the strategy and direction of the Company.

Indeed, ComScore's executives – in particular, CEO Wiener and President Hofstetter – sought to implement a strategy based upon the Company's growth to establish a cross-platform measurement currency. In contrast, the Company's Board sought to implement a strategy based upon cuts and cost-control measures that the Individual Defendants believed would compromise the Company's long-term goal to establish a cross-platform measurement currency. Accordingly, at the time Defendants made their statements and issued guidance for the Company, they knew such statements lacked a reasonable basis because of this fundamental disagreement, and that such statements were thereby false and misleading.

44.     In fact, subsequent articles that are based upon the accounts of former ComScore employees demonstrate that Defendants lacked a reasonable basis for their statements and issuance of guidance at the time such statements were made. An April 2, 2019 Digiday article entitled "'They were bringing back that integrity': Comscore's leadership shakeup concerns media partners" stated the following:

> Comscore recruited a duo of veteran marketers to lead its push for cross-platform measurement about a year ago.
>
> **But both leaders, CEO Bryan Wiener and president Sarah Hofstetter jointly resigned over the weekend, following a disagreement with the board on the company's direction**.
>
> **While Wiener painted a vision for a multichannel measurement company and wanted to invest more in product development, board members were largely risk-averse and pushed for ways to slim down the business, said a source familiar with the matter. This tension had existed for months, this source told Digiday**.
>
> "The board was a mismatch with this CEO. One has to give. [Wiener] realized, and I think did the right thing. If you're not on board [with this plan,] hire someone else," the source said.
>
> **The tension was teased by Wiener himself in his LinkedIn post. "I ultimately chose to leave as the Board and I had irreconcilable differences over how to execute the company's strategy," Wiener wrote**.
>
> Wiener and Hofstetter declined to comment. **A Comscore spokesperson confirmed the disagreement**.
>
> **"Although the Board and Bryan are generally aligned on the company's strategy, Bryan disagreed with the company regarding the execution of the**

*strategy*. We thank Bryan for his contributions over the past year and wish him well in his future endeavors.  Sarah Hofstetter, president, has also resigned from the company.  The company has no immediate plans to fill her position," a Comscore spokesperson emailed.

Wiener and Hofstetter, who both worked together at 360i, are heralded as thoughtful and impactful leaders.  Five executives who have worked with Wiener and Hofstetter in previous jobs or who have partnered with them told Digiday they were impressed by the work they had done at Comscore and, therefore, shocked by the news of their departures.  Comscore's stock was down by more than 20% in Monday's trading.

"I was completely surprised by the news.  We've been working very hard with Comscore, and the people at Comscore have been bending over backward for us.  We were finding some things that were promising there.  They still had a way to go, but there was some direction," said a media executive whose company works with Comscore.

Comscore had a refined focus thanks to Wiener and Hofstetter's leadership, this executive said.  Comscore had been pushing for cross-platform measurement and started with a new tool called Campaign Ratings.

"Comscore had always been all over the place in terms of their efforts so there was a lot of clarity to get this one thing to work.  They seemed to have a plan that they were emphasizing, that they understood the need to simplify things and moved faster," the executive said.

Indeed, a slide from Comscore's Jan. 25 investor presentation showed how the company moved from having 18 solutions defined with acronyms to four divisions.

Comscore "had a ton of little products.  I didn't know what they all did.  It had been incredibly confusing.  They knew what they should be working on and seemed disciplined on going after that," said the media executive.

Over the years, Comscore's reputation in the industry has been affected by monetary losses, confusing acronyms and its much-larger competitor Nielsen.  The hiring of Wiener and then Hofstetter helped boost Comscore's credibility.

"Their communication was, you can believe in us again.  We're going to make smart decisions.  They were bringing back that integrity and making decisions that they felt were in the best interest of their clients, employees and the industry at large," said an industry executive who had previously worked at 360i.

Going forward, two partners said they were concerned about Comscore's future direction.  On April 1, to respond to the executive changes, the company emailed partners saying, "They did not expect to make any changes and remain focused on providing excellent service and support," according to an executive who received

the email.

A Comscore spokesperson emailed Digiday, "We do not expect these changes to impact the work that we're doing for our clients or our strategy to be the trusted currency for planning, transacting, and evaluating media across platforms.  We continue to be uniquely positioned to become the modern currency for the cross-platform era, and the changes we've made today are directly in line with that vision."

Chris Apostle, iCrossing's chief media officer, said he was still confident in Comscore's value to the industry as a way to plan, buy and evaluate media across channels.

"While Wiener and Hofstetter played a solid role of late in helping to define how Comscore evolves going forward, we believe that the organization will still be fully capable of bringing an expanded cross-channel value to the market," Apostle emailed.

**But the media executive added, "If they were continuing to go in the same direction they had been, then this wouldn't have happened."**

And as shocking as it was for Comscore to lose two well-regarded industry executives, the fact that Wiener and Hofstetter left together wasn't surprising.

"Keep your friends close and your old bosses closer. Yeah, I wasn't surprised to see her join him.  They work ridiculously well together.  They're just the epitome of folks who see things through, so seeing it deteriorate that quickly is pretty shocking," said a marketing executive familiar with the duo.

45.    Similarly, an August 27, 2019 *Digiday* article entitled " 'A Rentrak takeover':

Inside the fallout from Comscore's executive shakeup" stated the following:

When the year began, Comscore appeared poised to make a legitimate run at Nielsen's dominance over the measurement industry and make cross-platform measurement, a long-held dream among advertisers, into a reality.  **Comscore was seemingly coming out of a bumpy period, marked by an accounting scandal in which the company misreported revenue from 2013 through 2015 and had its stock delisted from Nasdaq as a result**.

That was all to change when Comscore brought on Bryan Wiener as CEO in April 2018.  **The former CEO and chair of Dentsu Aegis Network's 360i who had joined Comscore's board in October, Wiener took the helm of Comscore with a plan to realize the cross-platform measurement promise of Comscore's February 2016 merger with TV measurement firm Rentrak, a promise postponed by the accounting scandal.  Wiener pointed the company's compass toward developing a cross-platform measurement currency.  The introduction of that currency, Comscore Campaign Ratings, as a beta test in September 2018 signaled that the Titanic was turning**.

*Then what had been a dream that was finally becoming a reality turned into a nightmare.   On March 31, 2019, Wiener and Comscore president Sarah Hofstetter — Wiener's successor at 360i who joined Comscore in September 2018 — announced their resignations from Comscore after the company's board demanded cuts that the pair argued would compromise their long-term strategy to establish a cross-platform measurement currency*.

*In their absence, the effort to combine Comscore and Rentrak to rival Nielsen appears to be coming undone, based on conversations with 12 people who have knowledge of the inner workings of Comscore's business following Wiener's and Hofstetter's departure, including former employees and agency executives*. Instead of overtaking Nielsen, Comscore has been overtaken by Rentrak, according to former Comscore employees.  Agency executives have similarly observed an emphasis on the TV measurement side of Comscore's overall business in conversations with the company's leadership, which now primarily consists of former Rentrak executives.

The TV and video advertising industries have been approaching an inflection point that holds the potential for the measurement industry to undergo its own seismic shift.  As the two media continue to merge, measurement across TV and digital has emerged as the foundation for adequately accounting for audiences and ad dollars on a like-for-like basis.  This inflection point has made an opening for a company like Comscore to challenge, if not usurp, Nielsen's standing as the preeminent measurement provider.  With its legacy digital measurement business and growing advanced TV measurement business, Comscore was considered especially well-positioned to measure media and advertising in an era when all media are delivered over the internet and ads are bought against advanced audience segments instead of traditional age-and-gender categories.  However, Comscore's aims appear to have narrowed to focus on growing the Rentrak side of the business in the short term.

**Cuts to Comscore**

While still considered by industry executives to be Nielsen's biggest rival, Comscore has shrunk in multiple respects following Wiener's and Hofstetter's resignations.  *The company's stock price has sunk from $20.25 on March 29 — two days before Wiener and Hofstetter announced their resignations — to less than $2, as of this writing*.  Its total revenue declined by 4% year over year to $96.9 million in the second quarter of 2019, while its net loss ballooned from $56.0 million in Q2 2018 to $279.5 million in Q2 2019.  Its ambitions have narrowed from competing with Nielsen's TV measurement business to concentrating on complementing it with Rentrak's advanced TV measurement capabilities that go beyond traditional age-and-gender-based measurement, according to multiple former employees.  *And multiple rounds of layoffs this year have diminished the company's product and sales teams, the former employees said*.

*On August 20, Comscore announced in a regulatory filing that it is laying off 8% of its workforce.  According to former Comscore employees, roughly 150 people are being let go, including evp of brand and agency sales Moritz Loew; evp Anthony Psacharopoulos; and svp of strategic partnerships and business development Sumit Shukla*.  These three executives reported to chief commercial officer Chris Wilson and were considered by former employees to represent the company's digital sales leadership.  Loew, in particular, was in charge of selling all Comscore services, including Rentrak, to advertisers and agencies, while Psacharopoulos worked with digital publishers and platforms.  Shukla's position is said to have been a hybrid role with an emphasis on working with walled gardens and platforms like Roku.  *That the trio represented the digital side of Comscore's business — i.e. its legacy online and mobile measurement business — may have made all the difference*.

In the wake of Wiener's and Hofstetter's departures, Comscore's digital business has taken a backseat to Rentrak's TV measurement business, according to multiple former Comscore employees.  Wiener, Hofstetter, Loew, Psacharopoulos and Shukla did not respond to requests for comment.

"The reality is that the marketplace is evolving.  Demand for standalone traditional digital services is declining.  Comscore is therefore focused on innovating in a multi-platform cross-media world — of which digital is a huge part.  It's inaccurate to say that Comscore has lost its digital leadership.  Further, our executive teams are speaking daily with agency and network executives who are helping guide our cross-platform strategy and innovation.  We'll be sharing more details on our new approach in the coming days.  Ultimately, we are redefining Comscore's mission to capitalize on our customers' needs.  We truly believe these changes will result in a more focused and successful company," said Comscore interim CEO Dale Fuller in an emailed statement.

**Comscore's rollercoaster history**

This is not how things were supposed to go for Comscore, though it's fitting for how things have gone for the company in recent years.  Rentrak had been meant to play a major role in Comscore's future when the two companies merged in 2016.  The former's TV-and-movie measurement business would appear to pair well with Comscore's online measurement business to finally bridge audience and advertising measurement across TV and digital.  However, an accounting scandal that came to light in 2016 set back the company's intentions until 2018 when Wiener was appointed CEO.

*"The whole genesis for the merger was to do cross-platform [measurement], and we never got it done," said one former Comscore employee*.

A longtime agency veteran, Wiener recognized Rentrak's importance to the company's future and set about integrating its TV measurement capabilities with Comscore's online measurement capabilities to create Comscore Campaign Ratings.  *Former employees said that, while Wiener did not bring a*

*measurement background to the role, he was a quick study and drew the right conclusions about what the company's priorities should be amid a shifting media-and-advertising market. Wiener had taken what former Comscore employees described as a slow and methodical approach to building up Comscore's cross-platform measurement business. He intended to grow Comscore's business in the short term — projecting modest growth in revenue and gross margins for 2019 — but not at the expense of setting up Comscore for the long-term opportunity to challenge Nielsen*.

*Comscore's board had other ideas and pressed Wiener and Hofstetter to make cuts. That led to Wiener's and Hofstetter's resignations, which almost immediately dropped the company's stock price from $20.25 on March 29 — two days before Wiener and Hofstetter announced their resignations — to $14.24 on the day after the news broke*.

Comscore's stock price has sunk even further in the months following Wiener's and Hofstetter's resignations. On August 26, shares in Comscore were trading for under $2. That devaluation has made Comscore an attractive acquisition target, and in recent weeks at least one company has inquired about acquiring Comscore, though Comscore's board is said to not have engaged in any acquisition talks.

The company's reticence to sell may have to do with the prevalence of former Rentrak execs among the company's board and leadership. Rentrak merged with Comscore in an all-stock deal. Considering that Comscore stock was trading at $41.15 on the day that the merger was finalized, Rentrak execs stand to make significantly less money if they are unable to turn around the company's stock price, if not the company.

**The cross-platform promise**

*By combining TV and digital measurement capabilities, the merger of Comscore and Rentrak was supposed to strengthen the combined measurement firm to contest Nielsen's dominance over the measurement market. What has come to pass instead is instability inside of Comscore. After Comscore's board pressed Wiener and Hofstetter to make cuts in order to generate short-term profits, the pair resigned. Rentrak executives have filled that leadership vacuum and prioritized the company's small-but-growing TV business in the near term, potentially at a cost to the company's long-term prospects*.

Agency execs are concerned that Comscore may be missing its window. *When Wiener and Hofstetter were at the helm, agency execs were able to have big-picture conversations with the pair about how to get cross-platform measurement off the ground. In their absence, those conversations are absent*. Conversations with Wilson are more "nuts and bolts, day-to-day things," said one agency exec. Meanwhile, interim CEO Fuller, who has a history of leading and serving on the boards of enterprise software firms, is considered "very smart, but he doesn't live the business because it's not his day job." On Comscore's most recent earnings call, Fuller was asked about Comscore's plans to hire a permanent

CEO — the search is a high priority for the company's board, he said — and said, "I look forward to getting back to retirement."  A former Comscore employee said the comment was characteristic of Fuller's habit of making jokes that sometimes fall flat.

While agency execs acknowledged that any new measurement product would face a long road to becoming a currency on which media is bought and sold, the rollout of Comscore Campaign Ratings, which remains in beta, has been slower than the agency execs had anticipated.  That slower-than-expected rollout has been aggravated by a feeling among agency execs that Comscore lacks the leadership that agency execs can turn to after encountering the kinds of hiccups natural to any developing product.

"I don't know, if Bryan or Sarah were still there, whether it would be any faster, but at least I would have somebody to whine to," said one agency exec.  This exec said that it has been more difficult to receive answers when technical glitches are found, and they've gotten the sense that the company is spread thin across its ranks.

The slow pace of Comscore's product development would make sense considering how decimated the company's product leadership team has become. ***In June, the company's chief product officer Dan Hess left the company, as did svp Naresh Rekhi. Since then svp of TV and cross-platform products Kendall McMahon has also left the company***.  However, while multiple former employees used the word "gutted" to describe Comscore's product team, they and the agency execs do not believe that explains the slow rollout of Comscore Campaign Ratings, which remains in testing. Instead, they believe it is an issue of Comscore not being able to get enough advertisers, agencies and media companies to adopt the product at a time when Nielsen is aggressively pushing its cross-platform measurement products.  "I don't know if they're going to get left behind. But they're definitely not going fast enough to lead the market because Nielsen is picking up the pace," said an agency exec.

**Enter Rentrak**

Multiple former Comscore employees used the words "a Rentrak takeover" to describe the shift inside the company following Wiener's and Hofstetter's departures.  They pointed to Rentrak executives dominating the company's leadership ranks and its shift in emphasis of TV measurement over digital measurement, which has also become apparent to agency execs.

These agency execs, who were interviewed before Comscore's more recent layoffs, feel that Comscore's sales team is strong across digital and TV and that the sales organization is unified between the two sides.  However, as they talk to people higher up in the company, the focus of the conversation shifts to the linear TV side, though that could have as much to do with those execs today commonly being former Rentrak execs as with a shift in the company's strategy.

Former Rentrak CEO Bill Livek serves as the vice-chairman of the company's board, and people inside and outside Comscore, including one agency exec, believe that he had been angling for the CEO position before, during and after Wiener held the role.  Former Rentrak board member Brent Rosenthal serves as the board's non-executive chairman.  Chief product officer David Algranati hails from Rentrak, as does chief commercial officer Chris Wilson, who had been fired for poor performance in the fourth quarter of 2018 before being brought back after Wiener and Hofstetter stepped down.

"It is not accurate to say that Chris Wilson was let go for performance-based reasons.  Chris and the company agreed to part amicably.  The current leadership team under interim CEO Dale Fuller brought Chris back to Comscore because they fully believe he is the best person to drive success in the marketplace," said Sara Dunn, svp of human resources at Comscore, in an emailed statement.

Livek, Algranati, Wilson and evp of national sales Carol Hinnant are considered by former employees to be the four most important people at the company today and they are all Rentrak alumni.  Furthermore, while Loew, Psacharopoulos and Shukla were let go, three other execs who report to Wilson and joined Comscore from Rentrak remain: Hinnant, evp of local TV Steve Walsh and svp of strategic partnerships Scott Worthem.

Comscore's shift in emphasis from its legacy digital business to Rentrak's TV business is not unfounded.  The company's syndicated digital measurement products represent the bulk of its biggest revenue segment, accounting for 50% of the $68.9 million that Comscore's "ratings and planning" segment generated in the second quarter of 2019.  However, that business is in decline, having accounted for 55% of the company's $70.5 million in "ratings and planning" revenue in Q3 2018.  Revenue from Comscore's TV and cross-platform measurement products, meanwhile, increased year over year in the period, though Comscore does not break out those two categories to show how much of the increase was driven by TV versus the cross-platform measurement products.

Additionally, the Rentrak execs likely have their reasons for emphasizing the company's growing TV business in order to buoy its sinking stock price.  ***Comscore's stock price had already had been a source of frustration among Rentrak execs in connection to the all-stock terms of the merger.  Roughly a month after the merger closed, Comscore disclosed the accounting issues, which immediately dropped its stock price by 30%, was later confirmed by an internal audit and led the company's stock to be delisted on Nasdaq in February 2017 (it regained its listing in June 2018).***

That scandal set the wrong foundation for the merger.  Rentrak executives looked at the Comscore employees, who were now their colleagues, as crooks even if they weren't involved in the scandal and contributed to a massive divide between Rentrak employees and legacy Comscore employees that were never fully addressed head-on, said a former Comscore employee. "Could you imagine being one of them and now here you are [with Comscore shares trading] at $2? I'd be

pissed off and unhappy too.  For that topic only, I don't blame them," said this former employee.

**"Just trying to live to fight another day"**

Particularly troubling for several former employees is the sense that Comscore is not concerned about competing with Nielsen.  Inside the company there is the sentiment that Comscore does not need to compete with Nielsen, that this is not a winner-take-all scenario.  While Nielsen dominates traditional TV measurement, Comscore executives are said by former employees to believe that they can leave that side of the market to Nielsen and that Comscore can focus on advanced TV measurement, where it notched a recent win a deal to be the measurement provider and currency for AT&T-owned Xandr's addressable TV advertising business.

However, it's not only that Comscore appears comfortable being a complement to Nielsen instead of a competitor.  What's making former employees and agency execs uncomfortable is the feeling that the company has narrowed its focus to the near term.  "The sales efforts to get stuff in our hands is still as strong as ever, but the 'what's the next thing to build?' Effort is quieter than it used to be," said one agency exec.

*Cross-platform and digital measurement remain part of Comscore's long-term strategy, but they have become less of the focus in the short term.  The short-term focus centers on linear and addressable TV measurement.  "They're just trying to live to fight another day," said one former employee.*

*Comscore's prospects are such that on August 14, the same day the Xandr deal was announced, Comscore announced that Paul Reilly — one of the board members who is said to have been among those clamoring for cuts — was resigning his seat.  Comscore executives have internally tried to downplay Reilly's resignation by telling employees that board members often resign for personal reasons.  But Reilly left no room for that kind of interpretation in the resignation letter he sent to the company on August 12.*

*"I do not believe the Company's go-forward operating strategy, in general, is progressing fast enough and specifically in innovation and product development," Reilly wrote.*

46.     In addition to the former ComScore employees discussed above who confirm that the Company's Board sought to implement a strategy based upon cuts that the Individual Defendants believed would compromise the Company's long-term goal to establish a cross-platform measurement currency, Confidential Witness ("CW") 1 also provides information that corroborates these accounts.  CW1 served as a Senior Director of Product Management at

ComScore from March 2006 to July 2019.  CW1 stated that no one at ComScore was in charge of the data strategy for the Company.  Specifically, CW1 stated that with respect to ComScore's Campaign Ratings, the Company's rollout was delayed because ComScore was having difficulties getting parties to implement the measurement.  CW1 stated that if ComScore wanted to implement a new metric, third parties, such as Hulu, would have to provide the data, which was a difficult task in many respects.  CW1 also stated that ComScore faced a myriad of issues with data rights that had to be addressed on a client-by-client basis.  Thus, according to CW1, ComScore had to work out agreements with parties such as ATT, Comcast, and Twitch regarding carriage issues and other details that required a great deal of attention and work.  As a result, CW1's account that no one at ComScore was in charge of the data strategy for the Company to address these issues further demonstrates that Defendants lacked a reasonable basis for their statements and guidance regarding the Company's long-term goal to establish a cross-platform measurement currency.

47.     On March 1, 2019, the Company filed its annual report on Form 10-K for the period ended December 31, 2018 that reaffirmed the previously-announced results.

48.     On Sunday, March 31, 2019, the Company announced the resignations of CEO Wiener and President Hofstetter, both of whom had been appointed to their positions less than one year prior to their resignations.  The Company also stated that it expected first quarter 2019 revenue to be between $100 million and $104 million, falling short of analysts' estimates of approximately $106 million in revenue.  In a press release, the Company stated, in relevant part:

**Senior Management Changes**

Dale Fuller, currently a director, was named interim chief executive officer following the resignation of Bryan Wiener, who is also stepping down from the board of directors effective today. Comscore's nominating and governance committee has initiated a search to identify a permanent chief executive officer and will consider external and internal candidates.

* * *

The board also announced that Sarah Hofstetter, president, will be resigning from the company. The company has no immediate plans to fill her position.

**Preliminary First Quarter 2019 Revenue**

Based on preliminary results, the company also announced today that first quarter 2019 revenue is expected to be between $100 million and $104 million.

Comscore expects to announce its first quarter 2019 earnings results in the first half of May, at which time the company will host a conference call to discuss its results and provide a progress report on the company's long-term vision and growth strategy.

49.     On April 1, 2019, the Company filed a Form 8-K with the SEC elaborating that Defendant Weiner had resigned because he "disagreed with the Company regarding the execution of [its] strategy."

50.     On this news, the Company's share price fell $6.01 per share, or nearly 30%, to close at $14.24 per share on April 1, 2019, on unusually heavy trading volume.

51.     On May 8, 2019, ComScore issued a press release to announce the Company's financial results for the first quarter of 2019.  Within the press release, the Company reported the following:

**First Quarter 2019 Financial Results**

- Total year-over-year revenue for the first quarter declined 3.4% to $102.3 million
- Net loss of $27.5 million, or $(0.46) per share, compared to a net loss of $51.5 million, or $(0.93) per share in the year-ago quarter
- Adjusted EBITDA loss of $2.5 million, compared to adjusted EBITDA of $3.6 million in the year-ago quarter
- Cash, cash equivalents and restricted cash of $42.8 million, compared to $50.2 million as of December 31, 2018

"As we sharpen our focus on the products our customers want, we will further strengthen our position in the marketplace. This will better enable us to expand our customer base, service our existing customers, and drive long-term value for our stockholders," said Dale Fuller, interim chief executive officer of Comscore.

"Over the past five weeks, we began a strategic review of the company, including all aspects of customer relationships, products, and organization structure," Fuller added.  "While the strategic review is still in process, we have identified and implemented actions this week that we believe will result in a better customer experience, improved organizational efficiency, and resources that are better aligned with business needs.  We expect these actions to decrease our annualized costs and cash outflow by approximately $20 million, or 5% of our core operating costs, a portion of which will be realized beginning in the second quarter of 2019."

**First Quarter Summary Results**

Total revenue in the first quarter of 2019 was $102.3 million, down from $105.9 million in the year-ago quarter.

Ratings and Planning revenue increased to $70.6 million in the first quarter of 2019, compared to $69.6 million in the year-ago quarter. The increase was primarily driven by TV products due to increases in contract values from existing customers and expanded market reach, offset by lower revenue in syndicated digital products due to ongoing industry changes in ad buying and consolidation.

Analytics and Optimization revenue declined to $21.5 million in the first quarter of 2019, compared to $25.7 million in the year-ago quarter. As previously disclosed, the first quarter of 2018 included certain digital customer solution deliveries from prior-year sales. This, in combination with a decline in current deliveries of digital customer solutions, resulted in lower revenue for the 2019 quarter as compared to the year-ago period. This decrease was offset by increased volume in Activation products.

Movies Reporting and Analytics revenue was $10.3 million in the first quarter of 2019, compared to $10.6 million in the year-ago quarter. The decrease principally related to lower project-based revenue in the quarter.

Net loss for the first quarter of 2019 was $27.5 million, or $(0.46) per share, compared to a net loss of $51.5 million, or $(0.93) per share reported in the year-ago quarter. The improvement was driven primarily by a reduction of investigation and audit related costs, as well as continued cost discipline in selling and marketing and research and development.

For the first quarter of 2019, non-GAAP adjusted EBITDA loss was $2.5 million, compared to positive adjusted EBITDA of $3.6 million in the year-ago quarter. Adjusted EBITDA excludes stock-based compensation expense; investigation, litigation and audit-related expense; restructuring (income) expense; change in fair value of financing derivatives; and other items as presented in the accompanying tables. Adjusted EBITDA for the first quarter of 2019 was impacted by additional non-stock expense of $2.4 million related to the resignation of certain executives.

52.     Additionally, the Company filed a Form 8-K with the SEC on May 8, 2019 in which it stated the following:

On May 7, 2019, the Company began implementing a reduction in force plan that, together with recent attrition, is expected to result in the termination of approximately 10% of the Company's workforce. The reduction in force is being implemented in order to enable the Company to decrease its costs and more effectively align resources to business priorities. Most of the employees impacted by the reduction in force will exit the Company in the second quarter of 2019, with the remainder expected to exit in the third quarter of 2019.

53.     Also on May 8, 2019, ComScore held a conference call to discuss the Company's financial results for the first quarter of 2019.  Dale Fuller, ComScore's director and interim CEO, and Defendant Fink participated in the call.  During the conference call, the Company stated that "we took steps yesterday to reduce our workforce by approximately 10%, which includes open positions that will not be filled."  The Company also refused to provide further guidance, stating that "[a]s for the year, we will update our revenue guidance when we have better clarity on the financial impact of the revised operating plan."

54.     The statements that the Company made in ¶¶51-53 constituted partial corrective disclosures regarding the impact of Defendants' false and misleading statements regarding the Company's growth and long-term goal to establish a cross-platform measurement currency.  On this news, the Company's stock price declined to close at $11.34 on May 9, 2019.

55.     On May 9, 2019, ComScore filed its quarterly report on Form 10-Q with the SEC for the first quarter of 2019 that reaffirmed the previously-announced results.

56.     On May 29, 2019, ComScore filed a Form 8-K with the SEC in which it announced that Robert Norman had resigned as a Class III director on May 22, 2019, effective immediately.

57.     On August 6, 2019, ComScore issued a press release in which the Company announced its financial results for the second quarter of 2019.  Specifically, the Company reported the following:

**Second Quarter 2019 Financial Results**
- Year-over-year revenue for the second quarter declined 4.4% to $96.9 million
- Including 2019 non-cash impairment charges totaling $241.6 million, net loss of $279.5 million, or $(4.61) per share, compared to a net loss of $56.0 million, or $(1.02) per share in the year-ago quarter
- Adjusted EBITDA loss of $3.2 million, compared to positive adjusted EBITDA of $1.3 million in the year-ago quarter
- Cash, cash equivalents and restricted cash of $53.8 million, compared to $50.2 million as of December 31, 2018

"In the second quarter, we took significant steps to better prioritize, refocus and invest in our product portfolio, and provide our customers with innovative technologies and services which we believe will drive us to a position of profitability and growth faster and more efficiently," said Dale Fuller, director and interim chief executive officer of Comscore.  "Additionally, we reduced core

operating costs in the quarter, which provided greater financial flexibility as we seek to maximize our resources. The management team is exploring all aspects of the business and is conducting a comprehensive strategic review of all our options, making sure that our talent is focused on developing compelling products that our customers want and need. We believe this approach should ultimately allow us to generate break-even to positive operating cash flow later this year."

**Second Quarter Summary Results**

Total revenue in the second quarter of 2019 was $96.9 million, down from $101.4 million in the year-ago quarter.

Ratings and Planning revenue decreased to $68.9 million in the second quarter of 2019, compared to $70.5 million in the year-ago quarter. The decrease was the result of a decline in syndicated digital products offset by higher revenue in TV and cross-platform products. TV and cross-platform product revenue was higher on a year-over-year basis due to higher local TV revenue and increased deliveries of cross-platform products.

Analytics and Optimization revenue declined to $17.3 million in the second quarter of 2019, compared to $20.5 million in the year-ago quarter. The decrease was related to lower digital custom marketing solution sales and deliveries in the second quarter of 2019 as compared to the prior-year period. This decrease was offset, in part, by increased revenue from Activation products.

Movies Reporting and Analytics revenue was $10.7 million in the second quarter of 2019, compared to $10.4 million in the year-ago quarter. The increase was driven by revenue from new products and new customers.

Due in part to a decline in market capitalization and revenue, the company performed an interim impairment assessment as of the end of the quarter. As a result of the assessment, the company took non-cash impairment charges totaling $241.6 million relating to an intangible asset and goodwill. These non-cash impairment charges do not directly impact the company's liquidity, cash flows, compliance with debt covenants, or future operations.

During the second quarter of 2019, the company recorded a $5.0 million liability related to the previously disclosed SEC investigation, which management believes is a reasonable estimate of the company's probable liability for this matter.

Primarily as a result of the non-cash impairment charges and legal accrual, net loss for the second quarter of 2019 was $279.5 million, or $(4.61) per share, compared to a net loss of $56.0 million, or $(1.02) per share reported in the year-ago quarter.

For the second quarter of 2019, non-GAAP adjusted EBITDA loss was $3.2 million, compared to positive adjusted EBITDA of $1.3 million in the year-ago quarter. Non-GAAP adjusted EBITDA excludes stock-based compensation

expense; investigation, litigation and audit-related expense; restructuring expense; change in fair value of financing derivatives; impairment charges; and other items as presented in the accompanying tables.

**Balance Sheet and Liquidity**

As of June 30, 2019, cash, cash equivalents and restricted cash were $53.8 million, including $4.9 million in restricted cash.  The cash balance as of June 30, 2019 is inclusive of $20.0 million in initial cash proceeds that the company received from a capital transaction that was completed toward the close of the quarter.  The transaction was intended to strengthen the company's balance sheet and maintain compliance with the minimum cash covenant in the company's senior secured convertible notes, which increases from $20.0 million to $40.0 million upon filing of the Form 10-Q for the quarter ended June 30, 2019. Total debt principal as of June 30, 2019, including $204.0 million of senior secured convertible notes, was $215.0 million.

58.   Also on August 6, 2019, ComScore held a conference call to discuss the Company's financial results for the second quarter of 2019.  Dale Fuller, ComScore's director and interim CEO, and CFO Fink participated in the call.   During the conference call, the Company stated that "we reported Q2 revenue of $96.9 million, which compares to revenue of $101.4 million reported in the second quarter of last year and $102.3 million in the first quarter." ComScore stated further that "[r]evenue from Ratings and Planning in the second quarter was $68.9 million, a decrease of $1.6 million from the prior-year quarter."

59.    Based upon this news, SunTrust lowered its revenue and EBITDA forecasts for ComScore, stating in a report dated August 6, 2019 that "limited visibility into the permanent CEO hire (who, when), revenue trajectory (given product portfolio rationalization, workforce reductions), and thus additional capital needs" caused SunTrust to "lower our price target to $4.50.  Similarly, in an August 6, 2019 report, William Blair stated that "ComScore reported second-quarter revenue and profits that were lower than we had expected" and that "[r]evenue growth for the third and fourth quarters is now expected to be fairly flat sequentially, which implies a decline of 6% in the third quarter and 11% in the fourth quarter."  The William Blair report also noted that "[a]fter delivering positive adjusted EBITDA for four straight quarters, adjusted EBITDA were negative for the second consecutive quarter" and that "[o]perating cash

flow also remained negative." A Jefferies August 7, 2019 report similarly stated that "[it was another tough quarter with revenues missing lowered guidance expectations."

60.   The Company's stock price closed on August 12, 2019 at $1.61 per share, down from its high of more than $23 per share on February 25, 2019, thereby causing substantial damage to investors.

## CLASS ACTION ALLEGATIONS

61.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired ComScore securities between February 28, 2019 and August 7, 2019, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

62.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ComScore's common shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of ComScore common stock were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by ComScore or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

63.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

64.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

65.   Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of ComScore; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

66.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### UNDISCLOSED ADVERSE FACTS

67.     The market for ComScore's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, ComScore's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired ComScore's securities relying upon the integrity of the market price of the Company's securities and market information relating to ComScore, and have been damaged thereby.

68.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of ComScore's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or

misrepresented the truth about ComScore's business, operations, and prospects as alleged herein.

69.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about ComScore's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

70.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

71.     During the Class Period, Plaintiff and the Class purchased ComScore's securities at artificially-inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

72.     Specifically, contrary to Defendants' representations on February 28, 2019 that the Company was focused on "driv[ing] revenue growth," that ComScore's "strategy of becoming a trusted currency for planning, transacting and evaluating media cross-platforms" was "working," and that the Company was "on the right track towards building a business that can deliver improved revenue growth with expanding margins over time," there was a fundamental disagreement that existed at the time between ComScore's executives and the Company's Board regarding the strategy and direction of the Company.  Indeed, ComScore's executives – in

particular, CEO Wiener and President Hofstetter – sought to implement a strategy based upon the Company's growth to establish a cross-platform measurement currency.  In contrast, the Company's Board sought to implement a strategy based upon cuts and cost-control measures that the Individual Defendants believed would compromise the Company's long-term goal to establish a cross-platform measurement currency.  Accordingly, at the time Defendants made their statements and issued guidance for the Company, they knew such statements lacked a reasonable basis because of this fundamental disagreement, and that such statements were thereby false and misleading.

73.     On Sunday, March 31, 2019, the Company announced the resignations of CEO Wiener and President Hofstetter, both of whom had been appointed to their positions less than one year prior to their resignations.  The Company also stated that it expected first quarter 2019 revenue to be between $100 million and $104 million, falling short of analysts' estimates of approximately $106 million in revenue.

74.     On April 1, 2019, the Company filed a Form 8-K with the SEC elaborating that Defendant Weiner had resigned because he "disagreed with the Company regarding the execution of [its] strategy."  On this news, the Company's share price fell $6.01 per share, or nearly 30%, to close at $14.24 per share on April 1, 2019, on unusually heavy trading volume.

75.     On May 8, 2019, ComScore issued a press release to announce the Company's financial results for the first quarter of 2019.  During ComScore's conference call to discuss the Company's financial results for the first quarter of 2019, ComScore stated that "we took steps yesterday to reduce our workforce by approximately 10%, which includes open positions that will not be filled."  ComScore, however, refused to provide further guidance for the Company, stating that "[a]s for the year, we will update our revenue guidance when we have better clarity on the financial impact of the revised operating plan."  Accordingly, these statements constituted partial corrective disclosures regarding the impact of Defendants' false and misleading statements.  On this news, the Company's stock price declined to close at $11.34 on May 9, 2019.

76.     On August 6, 2019, ComScore issued a press release in which the Company

announced its financial results for the second quarter of 2019.  Based upon this news, SunTrust lowered its revenue and EBITDA forecasts for ComScore, stating in a report dated August 6, 2019 that "limited visibility into the permanent CEO hire (who, when), revenue trajectory (given product portfolio rationalization, workforce reductions), and thus additional capital needs" caused SunTrust to "lower our price target to $4.50."  Similarly, in an August 6, 2019 report, William Blair stated that "ComScore reported second-quarter revenue and profits that were lower than we had expected" and that "[r]evenue growth for the third and fourth quarters is now expected to be fairly flat sequentially, which implies a decline of 6% in the third quarter and 11% in the fourth quarter."  The William Blair report also noted that "[a]fter delivering positive adjusted EBITDA for four straight quarters, adjusted EBITDA were negative for the second consecutive quarter" and that "[o]perating cash flow also remained negative."  A Jefferies August 7, 2019 report similarly stated that "[it was another tough quarter with revenues missing lowered guidance expectations."  The Company's stock price closed on August 12 at $1.61 per share, down from its high of more than $23 per share on February 25, 2019, thereby causing substantial damage to investors because of the representations and omissions alleged herein.

## SCIENTER ALLEGATIONS

77.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding ComScore, their control over, and/or receipt and/or modification of ComScore's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning ComScore, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

**(FRAUD-ON-THE-MARKET DOCTRINE)**

78. The market for ComScore's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, ComScore's securities traded at artificially-inflated prices during the Class Period. On February 25, 2019, the Company's share price closed at $23.22 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of ComScore's securities and market information relating to ComScore, and have been damaged thereby.

79. During the Class Period, the artificial inflation of ComScore's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about ComScore's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of ComScore and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

80. At all relevant times, the market for ComScore's securities was an efficient market for the following reasons, among others:

(a) ComScore shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, ComScore filed periodic public reports with the SEC and/or the NASDAQ;

(c) ComScore regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures,

such as communications with the financial press and other similar reporting services; and/or

(d)     ComScore was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

81.     As a result of the foregoing, the market for ComScore's securities promptly digested current information regarding ComScore from all publicly available sources and reflected such information in ComScore's share price.   Under these circumstances, all purchasers of ComScore's securities during the Class Period suffered similar injury through their purchase of ComScore's securities at artificially inflated prices and a presumption of reliance applies.

82.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.   Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.   All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.   Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

83.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking

statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of ComScore who knew that the statement was false when made.

**FIRST CLAIM**
**Violation of Section 10(b) of The Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

84.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

85.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase ComScore's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

86.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for ComScore's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

87.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about ComScore's financial well-being and prospects, as specified herein.

88.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of ComScore's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about ComScore and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

89.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

90.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing ComScore's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated

by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

91.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of ComScore's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired ComScore's securities during the Class Period at artificially high prices and were damaged thereby.

92.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that ComScore was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their ComScore securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

93.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

94.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## **SECOND CLAIM**

**Violation of Section 20(a) of The Exchange Act**
**<u>Against the Individual Defendants</u>**

95.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

96.     Individual Defendants acted as controlling persons of ComScore within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

97.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

98.     As set forth above, ComScore and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 30, 2019                    **GLANCY PRONGAY & MURRAY LLP**

By: *s/ Ex Kano S. Sams II*
Lionel Z. Glancy
Robert V. Prongay
Ex Kano S. Sams II
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160

**GLANCY PRONGAY & MURRAY LLP**
Lesley F. Portnoy (LP-1941)
230 Park Ave., Suite 530
New York, New York 10169
Telephone: (212)682-5340
Facsimile: (212) 884-0988
Email: lportnoy@glancylaw.com

*Attorneys for Lead Plaintiff and the Class*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On September 30, 2019, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 30, 2019, at Los Angeles, California.


*s/ Ex Kano S. Sams II*_____
Ex Kano S. Sams II