**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SERGII BRATUSOV, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>COMSCORE, INC., BRYAN WIENER, and GREGORY A. FINK,<br><br>Defendants. | Case No. 1:19-cv-03210-KPF |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF FACTS .................................................................................. 3

III.    STANDARD OF REVIEW ................................................................................. 6

IV.     PLAINTIFF ADEQUATELY ALLEGES VIOLATIONS OF THE EXCHANGE
        ACT .................................................................................................................... 7

        A.      Plaintiff Adequately Alleges that Defendants Made Materially False and
                Misleading Statements ............................................................................ 7

                1.      Defendants Falsely Represented that ComScore Was Focused Upon
                        Revenue Growth to Establish a Cross-Platform Measurement Currency
                        When They Knew That the Company's Board Insisted Upon Cost-Control
                        Measures That Undermined Revenue Growth and the Implementation of a
                        Cross-Platform Measurement Currency ...................................... 8

                2.      Defendants Had A Duty to Disclose the Internal Business
                        Disagreement ........................................................................ 11

                3.      Defendants' Misstatements Do Not Constitute Puffery or Opinions ........ 12

                4.      The PSLRA's Safe Harbor Provision Does Not Protect Defendants' False
                        and Misleading Statements .................................................... 15

                        (a)     The Safe Harbor Provision Does Not Apply to Defendants'
                                Misstatements of Current or Historical Facts .............................. 15

                        (b)     The PSLRA's Safe Harbor Provision Does Not Apply to
                                Defendants' Omissions ................................................. 16

                        (c)     The Company's Generalized Disclaimers Were Ineffective
                                Because They Warned of Risks that Had Already Materialized and
                                Were of Greater Magnitude Than Defendants Portrayed ............. 17

                        (d)     Plaintiff Adequately Alleges that Defendants Had Actual
                                Knowledge that Their Non-Forward-Looking Statements Were
                                False and Misleading ................................................... 18

                        (e)     Because Reasonable Minds Can Disagree Regarding the
                                Misleading Nature of Defendants' Representations, Dismissal
                                Under the Safe Harbor Defense is Unwarranted .......................... 18

i

B. Plaintiff Adequately Alleges that Defendants Acted with Scienter....................... 19

 1. Because the Facts Alleged Relate to the Company's Core Operations, They Support a Strong Inference of Scienter........................................... 20

 2. The Confidential Witness Adds to the Strong Inference of Scienter Alleged................................................................................................... 21

 3. The Departures of Several Key Company Executives Near the Time of the Company's Revelations Support a Strong Inference of Scienter.............. 22

C. Plaintiff Adequately Alleges Loss Causation ........................................................ 23

D. Plaintiff Adequately Alleges Control Person Liability......................................... 25

V. CONCLUSION.................................................................................................................. 25

# TABLE OF AUTHORITIES

<u>CASES</u>

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).................................................................................................... 7

*ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)......................................................................................... 25

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).................................................................................................... 6

*Bielousov v. GoPro, Inc.*,
    No. 16-cv-06654-CW, 2017 WL 3168522 (N.D. Cal. July 26, 2017)........................... 13, 14, 16

*Brumbaugh v. Wave Sys. Corp.*,
    416 F. Supp. 2d 239 (D. Mass. 2006) ....................................................................... 14

*Caiola v. Citibank, N.A., New York*,
    295 F.3d 312 (2d Cir. 2002)....................................................................................... 12

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012)........................................................................ 12, 18, 19

*City of Providence v. Aeropostale, Inc.*,
    No. 11 Civ. 7132 (CM) (THK), 2013 WL 1197755 (S.D.N.Y. Mar. 23, 2013)................. 14, 16

*Cutler v. Kirchner*,
    No. 15-56897, 2017 WL 3530893 (9th Cir. Aug. 17, 2017) ..................................... 12

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)................................................................................................... 23, 24, 25

*Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017)......................................................................... 1, 21, 22

*Freudenberg v. E*Trade Financial Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010).......................................................................... 17, 20, 21, 25

*Friedman v. Rayovac Corp.*,
    295 F. Supp. 2d 957 (W.D. Wisc. 2003)...................................................................... 14

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000)........................................................................................ 7

*Hill v. Gozani*,
   638 F.3d 40 (1st Cir. 2011) ................................................................................................ 12

*Ho v. Duoyuan Global Water, Inc*.,
   887 F. Supp. 2d 547 (S.D.N.Y. 2012) ................................................................................ 22

*Illinois State Bd. of Inv. v. Authentidate Holding Corp.*,
   369 F. App'x 260 (2d Cir. 2010) ........................................................................................ 18

*In re Alstom SA Sec. Litig.*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005) ........................................................................ 7, 8, 9, 10

*In re Atossa Genetics Inc. Sec. Litig*.,
   868 F.3d 784 (9th Cir. 2017) .............................................................................................. 18

*In re Avon Sec. Litig.*,
   No. 19 CIV. 01420 (CM), 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ...................... 10, 11

*In re Computer Associates Class Action Sec. Litig.,*
   75 F. Supp. 2d 68 (E.D.N.Y. 1999) .................................................................................... 13

*In re Deutsche Bank AG Sec. Litig.*,
   No. 09 CV 1714 (DAB), 2016 WL 4083429 (S.D.N.Y. July 25, 2016) ............................ 12

*In re Discovery Labs. Sec. Litig*.,
   No. 06-1820, 2006 WL 3227767 (E.D. Pa. Nov. 1, 2006) ................................................ 14

*In re Fairway Grp. Holding Corp. Sec. Litig.*,
   No. 14 CIV. 0950 LAK, 2015 WL 249508 (S.D.N.Y. Jan. 20, 2015) ............................... 20

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
   No. 11 CIV. 3658, 2012 WL 2512280 (S.D.N.Y. June 29, 2012) ..................................... 16

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006) ................................................................................ 11

*In re MGM Mirage Sec. Litig.*,
   No. 2:09-CV-01558-GMN, 2013 WL 5435832 (D. Nev. Sept. 26, 2013) ....................... 13

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010) .......................................................................................... 11, 12

*In re NTL, Inc. Sec. Litig.*,
   347 F. Supp. 2d 15 (S.D.N.Y. 2004) .................................................................................. 17

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010)..................................................................................... 23

*In re Salix Pharm., Ltd.*,
  No. 14-CV-8925 (KMW), 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016).................... 16, 18, 20

*In re Scottish Re Grp. Sec. Litig.*,
  524 F. Supp. 2d 370 (S.D.N.Y. 2007)..................................................................... 22

*In re Secure Computing Corp. Sec. Litig.*,
  184 F. Supp. 2d 980 (N.D. Cal. 2001) .............................................................. 13, 16

*In re Time Warner Inc. Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993) ..................................................................................... 9, 11

*In re Vivendi Universal, S.A.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003)..................................................................... 14

*In re Vivendi Universal, S.A.*,
  No. 02 CIV. 5571 (RJH), 2004 WL 876050 (S.D.N.Y. Apr. 22, 2004) ................... 13

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016)............................................................................. 15, 25

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005).................................................................................. 23

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015)............................................................................. 23, 24

*Lormand v. U.S. Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ....................................................................... 10, 18, 25

*Manavazian v. Atec Group*,
  160 F. Supp. 2d 468 (E.D.N.Y. 2001) .................................................................. 13

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011).................................................................................................. 20

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014).................................................................................. 11

*Mulligan v. Impax Labs., Inc.*,
  36 F. Supp. 3d 942 (N.D. Cal. 2014) .......................................................... 13, 14, 16

*Murphy v. Precision Castparts Corporation*,
   No. 3:16-CV-00521-SB, 2017 WL 3084274 (D. Or. June 27, 2017) ................................ 13, 16

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) .................................................................................... 19, 21

*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
   367 F. Supp. 3d 16 (S.D.N.Y. 2019) ............................................................................. 20

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015) .............................................................................................. 13, 14

*P. Stolz Family Partnership L.P. v. Daum*,
   355 F.3d 92 (2d Cir. 2004) ..................................................................................... 15, 16

*Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co.*,
   No. 15 CIV. 5999 (PGG), 2017 WL 4403314 (S.D.N.Y. Sept. 30, 2017) ............................. 12

*Rihn v. Acadia Pharm. Inc.*,
   No. 15CV00575 BTM(DHB), 2016 WL 5076147 (S.D. Cal. Sept. 19, 2016) ................... 13, 16

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ....................................................................................... 17

*Sgalambo v. McKenzie*,
   739 F. Supp. 2d 453 (S.D.N.Y. 2010) ...................................................................... 16, 18

*Slayton v. Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010) .............................................................................. 15, 18, 19

*Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*,
   771 F. App'x 494 (2d Cir. 2019) ................................................................................. 12

*Stevelman v. Alias Research Inc.*,
   174 F. 3d 79 (2d Cir. 1999) ........................................................................................ 19

*Stratte-McClure v. Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015) ......................................................................................... 12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .......................................................................................... 7, 19, 20, 22

STATUTES

15 U.S.C. §78u-4(b)(1)(B) ........................................................................................................ 7

15 U.S.C. §78u-4(b)(2) ............................................................................................................ 19

15 U.S.C. §78u-4(b)(4) ............................................................................................................ 23

15 U.S.C. §78u-5(c) ................................................................................................................. 15

15 U.S.C. §78u–5(c)(1)(B)(i) .................................................................................................. 18

REGULATIONS

17 C.F.R. §229.303 .................................................................................................................. 12

## I.    INTRODUCTION

ComScore, Inc. ("ComScore" or the "Company") has been plagued with numerous instances of accounting scandals and fraud.  *See Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 534-63 (S.D.N.Y. 2017).  For example, between February 2014 and February 2016, ComScore – which creates products by combining information about content and advertising consumption on digital platforms, televisions, and movie screens with demographics and other descriptive information – materially overstated revenue by approximately $50 million. ComScore engaged in this fraudulent scheme and improper accounting by manipulating non-monetary and monetary contracts.  The actions of ComScore and the Company's former Chief Executive Officer ("CEO") Serge Matta enabled the company to artificially exceed analysts' consensus revenue target in seven consecutive quarters.

ComScore also entered into non-monetary transactions for the purpose of improperly increasing revenue recognition.  As a result, ComScore overstated revenue related to these transactions by over $34.5 million.  In multiple instances, ComScore misrepresented or failed to disclose the true facts related to particular contracts to ComScore's internal accountants and its independent auditor, which had the impact of overstating revenue by approximately $12 million. In other instances, ComScore agreed to deliver data to a counterparty by the end of a quarter, and then entered into undisclosed side agreements to deliver additional data after the quarter closed. This fraud enabled ComScore to improperly recognize all of the revenue associated with the transaction in that quarter rather than defer some or all of the revenue to subsequent quarters.  On September 24, 2019, the Securities and Exchange Commission ("SEC") found that the Company committed numerous securities violations.  ¶31.[1]  As a result, the SEC ordered ComScore to

---

[1]    Unless otherwise specified, all paragraph ("¶") references are to Plaintiff's Amended Class Action Complaint for Violations of the Federal Securities Laws ("Complaint").

cease and desist from committing any future securities violations and ordered the Company to pay a $5 million civil penalty to the SEC.

ComScore's fraudulent conduct, however, has continued.  Between February 28, 2019 and August 7, 2019, inclusive (the "Class Period"), Defendants continued to violate the Securities Exchange Act of 1934 ("Exchange Act").[2]  Specifically, Defendants represented that the Company was focused on "driv[ing] revenue growth," that ComScore's "strategy of becoming a trusted currency for planning, transacting and evaluating media cross-platforms" was "working," and that the Company was  "on the right track towards building a business that can deliver improved revenue growth with expanding margins over time."  ¶¶35-36.  There was a fundamental disagreement, however, that existed at the time between CEO Wiener and President Sarah Hofstetter ("Hofstetter") and the Company's Board of Directors ("Board") regarding the strategy and direction of the Company.  Indeed, Wiener and Hofstetter sought to implement a strategy based upon the Company's growth to establish a cross-platform measurement currency. In contrast, the Company's Board sought to implement a strategy based upon cost-control measures that CEO Wiener and President Hofstetter believed would compromise the Company's long-term goal to establish a cross-platform measurement currency.  Accordingly, at the time Defendants made their statements and issued guidance for the Company, they knew such statements lacked a reasonable basis because of this fundamental disagreement, and that such statements were thereby false and misleading.

Plaintiff's Complaint adequately states a claim under the Exchange Act.  Contrary to the arguments raised in Defendants' Memorandum of Law in Support of Their Motion to Dismiss

---

[2]   Defendants are ComScore, CEO Bryan Wiener ("Wiener"), and Chief Financial Officer ("CFO") Gregory A. Fink ("Fink").  CEO Wiener and CFO Fink are collectively the "Individual Defendants."

("Motion"), Plaintiff has adequately alleged falsity, scienter, and loss causation. Accordingly, the Court should deny Defendants' Motion.

## II.    STATEMENT OF FACTS

ComScore purports to be an information and analytics company that measures consumer audiences and advertising across media platforms. ¶¶2, 15. Throughout the Class Period, Defendants falsely represented that ComScore was focused upon revenue growth to establish a cross-platform measurement currency when they knew that the Company's Board insisted upon cost-control measures that undermined revenue growth and the implementation of a cross-platform measurement currency.

For instance, Defendants represented that "[i]n the fourth quarter, we continued to expand our customer relationships, drive revenue growth, and improve our cost structure while investing in product development, resulting in our fourth straight quarter of positive adjusted [Earnings Before Interest, Tax, Depreciation, and Amortization ("EBITDA")]." ¶35. Defendants also stated that "[w]e continue to benefit from shifts in the media landscape that demand a better solution and currency for measuring media across platforms. 2018 was a meaningful step forward in the transformation of Comscore, and we are now leveraging a stronger foundation to execute into 2019 and beyond." *Id*. Defendants further represented that "[t]he headline today is our strategy of becoming a trusted currency for planning, transacting and evaluating media cross-platforms is working" and that "we do believe today's report is yet another proof point that we're on the right track towards building a business that can deliver improved revenue growth with expanding margins over time." ¶36. During the Company's February 28, 2019 conference call, Defendants also provided guidance for 2019, stating that "[f]or 2019, we anticipate mid-single digit revenue growth, a slight improvement in gross margins over 2018 and generally flat non-GAAP operating expenses relative to 2018. We expect our adjusted EBITDA margin will

3

expand in the second half of the year and come in at mid-single digits for the year." ¶37.

Contrary to Defendants' optimistic representations throughout the Class Period, there was a fundamental disagreement that existed between the Company's executives and the Company's Board regarding the strategy and direction of the Company. Namely, ComScore's executives – in particular, CEO Wiener and President Hofstetter – sought to implement a strategy based upon the Company's growth to establish a cross-platform measurement currency for the Company. ¶¶43-45. Conversely, the Company's Board sought to implement a strategy based upon cuts and cost-control measures that Wiener and Hofstetter believed would compromise ComScore's long-term goal to establish a cross-platform measurement currency. *Id*. Defendants failed to disclose this fundamental disagreement to investors. *Id*.

Indeed, an April 2, 2019 Digiday article entitled "'They were bringing back that integrity': Comscore's leadership shakeup concerns media partners" stated that "CEO Bryan Wiener and president Sarah Hofstetter jointly resigned over the weekend, following a disagreement with the board on the company's direction." ¶44. The article stated further that "[w]hile Wiener painted a vision for a multichannel measurement company and wanted to invest more in product development, board members were largely risk-averse and pushed for ways to slim down the business, said a source familiar with the matter." *Id*. Importantly, the article reported that the source indicated "***this tension had existed for months***." *Id*. CEO Wiener confirmed this disagreement when he posted the following on his LinkedIn post: "I ultimately chose to leave as the Board and I had irreconcilable differences over how to execute the company's strategy." *Id*. A ComScore spokesperson also confirmed the disagreement by stating that CEO Wiener "disagreed with the company regarding the execution of the strategy." *Id*.

As a result of this disagreement, on March 31, 2019, the Company announced the

4

resignations of CEO Wiener and President Hofstetter, both of whom had been appointed to their positions less than one year prior to their resignations. ¶48. The Company also stated that it expected first quarter 2019 revenue to be between $100 million and $104 million, falling short of analysts' estimates of approximately $106 million in revenue. *Id*. On this news, the Company's stock price fell $6.01 per share, or nearly 30%, to close at $14.24 per share on April 1, 2019, on unusually heavy trading volume. ¶¶49-50.

Similarly, an August 27, 2019 *Digiday* article entitled "'A Rentrak takeover': Inside the fallout from Comscore's executive shakeup" stated that "Wiener took the helm of Comscore with a plan to realize the cross-platform measurement promise of Comscore's February 2016 merger with TV measurement firm Rentrak, a promise postponed by the accounting scandal." ¶45. The article stated further that "Wiener pointed the company's compass toward developing a cross-platform measurement currency." *Id*. The article also stated that according to former company employees, "Comscore has shrunk in multiple respects following Wiener's and Hofstetter's resignations," that "multiple rounds of layoffs this year have diminished the company's product and sales teams," and that the Company "is laying off 8% of its workforce." *Id*. According to one former ComScore employee, "[t]he whole genesis for the merger [with Rentrak] was to do cross-platform [measurement], and we never got it done." *Id*. Former employees also stated that CEO Wiener took "a slow and methodical approach to building up Comscore's cross-platform measurement business," in which "[h]e intended to grow Comscore's business in the short term — projecting modest growth in revenue and gross margins for 2019 — but not at the expense of setting up Comscore for the long-term opportunity to challenge Nielsen." *Id*. "By combining TV and digital measurement capabilities, the merger of Comscore and Rentrak was supposed to strengthen the combined measurement firm to contest Nielsen's

dominance over the measurement market." *Id.* In contrast, "Comscore's board had other ideas and pressed Wiener and Hofstetter to make cuts." *Id.* "After Comscore's board pressed Wiener and Hofstetter to make cuts in order to generate short-term profits, the pair resigned." *Id.* As a result, "Rentrak executives have filled that leadership vacuum and prioritized the company's small-but-growing TV business in the near term, potentially at a cost to the company's long-term prospects." *Id.*

Additionally, multiple former employees stated that the Company's product leadership team was "decimated" and "gutted." *Id.* "In June, the company's chief product officer Dan Hess left the company, as did svp Naresh Rekhi. Since then svp of TV and cross-platform products Kendall McMahon has also left the company." *Id.* Multiple former ComScore employees also used the words "a Rentrak takeover" to describe the shift inside the company following Wiener's and Hofstetter's departures. *Id.* "They pointed to Rentrak executives dominating the company's leadership ranks and its shift in emphasis of TV measurement over digital measurement." *Id.*

On August 14, "the same day the Xandr deal was announced, Comscore announced that Paul Reilly — one of the board members who is said to have been among those clamoring for cuts — was resigning his seat." *Id.* "Comscore executives have internally tried to downplay Reilly's resignation by telling employees that board members often resign for personal reasons." *Id.* "But Reilly left no room for that kind of interpretation in the resignation letter he sent to the company on August 12," stating that "'I do not believe the Company's go-forward operating strategy, in general, is progressing fast enough and specifically in innovation and product development.'" *Id.* ComScore's stock price plummeted, and closed on August 12, 2019 at $1.61 per share, down from its high of more than $23 per share on February 25, 2019. ¶60.

## III.    STANDARD OF REVIEW

A plaintiff's allegations need only be "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S.

6

544, 570 (2007).[3] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must "accept all factual allegations in the complaint as true" and "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007). Additionally, courts must also draw "all reasonable inferences in the plaintiffs' favor." *Ganino v. Citizens Utilities Co*., 228 F.3d 154, 161 (2d Cir. 2000).

## IV.   PLAINTIFF ADEQUATELY ALLEGES VIOLATIONS OF THE EXCHANGE ACT

### A.   Plaintiff Adequately Alleges that Defendants Made Materially False and Misleading Statements

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA") – which is applicable to claims under Section 10(b) of the Exchange Act – a plaintiff adequately pleads falsity by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B). Statements are actionably false if they "affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed." *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005). Such is the case here.

---

[3]   Unless otherwise indicated, all emphasis is added and all internal citations and quotations are omitted.

**1.      Defendants Falsely Represented that ComScore Was Focused Upon Revenue Growth to Establish a Cross-Platform Measurement Currency When They Knew That the Company's Board Insisted Upon Cost-Control Measures That Undermined Revenue Growth and the Implementation of a Cross-Platform Measurement Currency**

Defendants falsely represented that ComScore was focused upon revenue growth and the implementation of a cross-platform measurement currency.  Specifically, Defendants stated that "[i]n the fourth quarter, we continued to expand our customer relationships, drive revenue growth, and improve our cost structure while investing in product development, resulting in our fourth straight quarter of positive adjusted EBITDA."  ¶35.  Defendants further represented that "our strategy of becoming a trusted currency for planning, transacting and evaluating media cross-platforms is working" and that "we're on the right track towards building a business that can deliver improved revenue growth with expanding margins over time."  ¶36.[4]

Defendants' representations, however, were false and misleading.  Contrary to Defendants' claims, there was a fundamental disagreement that existed at the time between ComScore's executives and the Company's Board regarding the strategy and direction of the Company.  ¶¶43-46.  Indeed, the Company's Board sought to implement a strategy based upon cuts and cost-control measures that CEO Wiener and President Hofstetter believed would compromise ComScore's long-term goal to establish a cross-platform measurement currency. *Id*.  Defendants failed to disclose this fundamental disagreement to investors.  *Id*.  As a result of this disagreement, on March 31, 2019, the Company announced the resignations of CEO Wiener and President Hofstetter.  ¶48.  The Company also stated that it expected first quarter 2019

---

[4]      Analysts and investors were keenly focused upon Defendants' optimistic statements regarding the prospects of the Company's growth and ComScore's long-term strategy to establish a cross-platform measurement currency.  ¶38.  For example, a February 28, 2019 Equity Research report from William Blair stated that "[w]e believe management's guidance implies that the company exits the year with high-single-digit revenue growth and high-single-digit EBITDA margins." *Id*.

revenue to be between $100 million and $104 million, falling short of analysts' estimates of approximately $106 million in revenue. *Id.* On this news, the Company's stock price fell $6.01 per share, or nearly 30%, to close at $14.24 per share on April 1, 2019, on unusually heavy trading volume. ¶¶49-50.

The Second Circuit's decision in *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259 (2d Cir. 1993) demonstrates that Plaintiff has adequately alleged falsity. In *Time Warner*, the company made several public statements about its efforts to find "strategic partners" who would infuse billions of dollars of capital into the company. *Id.* at 262. During the same period of time that the company was making these statements, the company was also considering (and ultimately chose) an alternative method of raising capital – a new stock offering that substantially diluted the rights of the existing shareholders. *Id.*

The plaintiffs filed a claim under the Exchange Act against the company based, among other things, on the company's failure to disclose that it was considering an alternative method of raising capital. *Id.* The district court concluded that the statements concerning the search for strategic partnerships were accurate when made and that subsequent events did not obligate Time Warner to correct or update those statements. *Id.* at 263. The Second Circuit reversed the district court's decision, declaring that "when a corporation is pursuing the specific business goal and announces that goal as well as an intended approach for reaching it, it may come under an obligation to disclose other approaches to reaching the goal when those approaches are under active and serious consideration." *Id.* at 268. The court reasoned that:

> Time Warner's public statements could have been understood by reasonable investors to mean that the company hoped to solve the entire debt problem through strategic alliances. Having publicly hyped strategic alliances, Time Warner may have come under a duty to disclose facts that would place the statements concerning strategic alliances in a materially different light.

*Id.*

The decision in *Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228 (5th Cir. 2009), is in accord. In *Lormand*, the plaintiffs alleged that U.S. Unwired had been pressured by Sprint, with whom it had an affiliate relationship, to extend services to customers with sub-prime credit without requiring the usual safeguards. *Id.* at 234-35. Through a series of negotiations, it became clear that the management of U.S. Unwired knew the business strategy would prove unsuccessful, saw some of the risks actually materialize, and fought hard – if unsuccessfully – to prevent the policy's full implementation. *Id.* at 237, 247. Simultaneously, U.S. Unwired's public statements touted the benefits of the program and "omitted [the] serious risks inherent" in the initiatives. *Id.* at 249. When defendants referenced risks, they did so generally, and the real potential problems were "glossed over as a future risk of *limited* magnitude." *Id.* at 247 (italics in original).

The same situation exists here. Contrary to Defendants' assertions (Motion at 9-11), the internal disagreement between CEO Wiener and President Hofstetter on the one hand, and the Company's Board on the other hand, demonstrates the falsity of Defendants' representations. By falsely representing that ComScore was focused on "driv[ing] revenue growth," that the Company's "strategy of becoming a trusted currency for planning, transacting and evaluating media cross-platforms" was "working," and that the Company was "on the right track towards building a business that can deliver improved revenue growth" without disclosing that the Company's Board was actively and seriously considering – and ultimately chose – a strategy diametrically opposed to the strategy that Defendants publicly represented, Defendants "affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed." *Alstom*, 406 F. Supp. 2d at 453. Thus, Plaintiff has adequately

10

alleged falsity.  *In re Avon Sec. Litig.*, No. 19 CIV. 01420 (CM), 2019 WL 6115349, at *13-19 (S.D.N.Y. Nov. 18, 2019).[5]

### 2.   Defendants Had A Duty to Disclose the Internal Business Disagreement

Defendants claim that they had no duty to disclose the business disagreement between CEO Wiener and President Hofstetter and the Company's Board.  Motion at 8-10.  Defendants are incorrect.  A corporation has a duty to disclose a fact in order to avoid misleading investors if there "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available." *Time Warner*, 9 F.3d at 267–68.  Indeed, as the Second Circuit has repeatedly declared, "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010).  Accordingly, when an issuer or its officers "make a disclosure – whether it be voluntary or required – there is a duty to make it complete and accurate." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006); *Avon*, 2019 WL 6115349 at *14.

Defendants failed to do so here.  Defendants chose to speak by falsely representing that ComScore was focused on driving revenue growth.  ¶¶35-36.  Defendants' representations, however, were not complete, accurate, and truthful because Defendants failed to disclose that the

---

5   Defendants suggest that ComScore's strategy of developing a cross-platform measurement currency "remained in place."  Motion at 11.  Defendants, however, ignore Plaintiff's allegations demonstrating that ComScore never achieved its goal of establishing a cross-platform measurement currency.  According to one former ComScore employee, "[t]he whole genesis for the merger [with Rentrak] was to do cross-platform [measurement], and we never got it done."  ¶45.  Additionally, Defendants' contention that "[t]he totality of the Complaint's discussion of the purported reasons why the Alleged Misstatements are misleading is contained in a single conclusory paragraph" (Motion at 10) is incorrect.  *See, e.g.*, ¶¶43-46.

Company's Board demanded the implementation of a cost-cutting strategy that completely undermined the revenue-growth strategy that Defendants touted to investors. Thus, "the lack of an independent duty is not, under such circumstances, a defense to Rule 10b–5 liability because upon choosing to speak, one must speak truthfully about material issues." *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 331 (2d Cir. 2002).[6]

### 3. Defendants' Misstatements Do Not Constitute Puffery or Opinions

Contrary to Defendants' assertions, their misstatements do not constitute puffery or opinions. First, Defendants suggest that CEO Wiener's statement that "[w]e continue to benefit from shifts in the media landscape that demand a better solution and currency for measuring media across platforms" and that "2018 was a meaningful step forward in the transformation of Comscore, and we are now leveraging a stronger foundation to execute into 2019 and beyond" constitutes puffery. Motion at 12. Courts, however, have held that similar statements are actionable. *See, e.g.*, *Cutler v. Kirchner*, No. 15-56897, 2017 WL 3530893, at *3-4 (9th Cir. Aug. 17, 2017) (statement that "1View is working" is actionable); *City of Pontiac Gen. Empls.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 366 (S.D.N.Y. 2012) (holding that

---

[6] Defendants' citations do not support their position. In *Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494 (2d Cir. 2019), the court held that "the business strategy decision on which [plaintiffs] rely is not the type of disclosure" required by Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303. *Id*. at 498. Because Plaintiff here does not premise liability upon Item 303, *Steamfitters* is inapplicable. The same is true for *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 105 (2d Cir. 2015), *Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co.*, No. 15 CIV. 5999 (PGG), 2017 WL 4403314 (S.D.N.Y. Sept. 30, 2017), and *In re Deutsche Bank AG Sec. Litig.*, No. 09 CV 1714 (DAB), 2016 WL 4083429 (S.D.N.Y. July 25, 2016). Additionally, as noted above, *Morgan Stanley*, 592 F.3d 347, **supports** Plaintiff's position that once a corporation makes "a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate." *Morgan Stanley*, 592 F.3d at 366. The notion in *Morgan Stanley* that particular disclosures "did not obligate defendants to make disclosures relating to the commonly understood risks associated with securities research" (*id*. at 347) is inapplicable here because the cost-cutting strategy demanded by ComScore's Board did not constitute a "commonly understood" risk. *Hill v. Gozani*, 638 F.3d 40 (1st Cir. 2011) is distinguishable because, unlike here, the court found that the undisclosed information was not significant in magnitude to require disclosure. *Id*. at 59.

statements that the company "was doing well, had no performance issues, had a solid backlog, and had a strong win rate driving its performance" were actionable); *In re Computer Associates Class Action Securities Litigation,* 75 F. Supp. 2d 68, 71 (E.D.N.Y. 1999) (holding that representation that a company's whose order "pipeline was strong" was actionable).

Second, Defendants contend that the statement "[w]e do believe today's report is yet another proof point that we're on the right track towards building a business that can deliver improved revenue growth with expanding margins over time" constitutes puffery and a non-actionable opinion. Motion at 13. Defendants are wrong on both counts. Numerous courts have held that a company's statements that its "growth model was still on track" are actionable. *Manavazian v. Atec Group*, 160 F. Supp. 2d 468, 473-74 (E.D.N.Y. 2001); *see also In re Vivendi Universal, S.A.*, No. 02 CIV. 5571 (RJH), 2004 WL 876050, at *7 (S.D.N.Y. Apr. 22, 2004) (statements that a company was "on track" to achieve earnings targets were actionable).[7]

Defendants, moreover, are not immune from liability simply because they may have prefaced some of their statements with the words "we believe" or "we think." Motion at 13. In *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015), the Supreme Court affirmed that statements of opinion are actionable if either "the speaker did not

---

[7]    *See also Bielousov v. GoPro, Inc*., No. 16-cv-06654-CW, 2017 WL 3168522, at *5 (N.D. Cal. July 26, 2017) (holding that statement that the company was "on track to make its previously-issued revenue guidance" was actionable); *Murphy v. Precision Castparts Corporation*, No. 3:16-CV-00521-SB, 2017 WL 3084274, at *3 (D. Or. June 27, 2017) (holding that statements that a company was "on track" to meet its guidance were actionable); *Rihn v. Acadia Pharm. Inc.*, No. 15CV00575 BTM(DHB), 2016 WL 5076147, at *7 (S.D. Cal. Sept. 19, 2016) (statements about the company remaining "on track" were "not vague statements of optimism, but, rather, statements premised on facts"); *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 957, 966-68 (N.D. Cal. 2014) (holding that statements that the company was "on track" were actionable); *In re MGM Mirage Sec. Litig.*, No. 2:09-CV-01558-GMN, 2013 WL 5435832, at *7 (D. Nev. Sept. 26, 2013) (statements that project was "on track" were actionable); *In re Secure Computing Corp. Sec. Litig.*, 184 F. Supp. 2d 980, 990-91 (N.D. Cal. 2001) (holding that statements that the company was "on track to meet expectations" were actionable).

hold the belief she professed" or if "the supporting fact she supplied were untrue." *Id*. at 185-86. Importantly, the Court held that opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor. *Id*. at 194.

Accordingly, merely couching representations with the preface "we believe" will not insulate defendants from liability where, as here, Defendants omitted information whose omission makes the statement misleading. *See, e.g.*, *Bielousov*, 2017 WL 3168522, at *4 (holding that under *Omnicare*, statement that "[w]e believe we're still on track" to make the company's revenue guidance is an actionable "statement of present opinion"). Indeed, "a statement is not immaterial as a matter of law simply because the speaker prefaces it with 'I believe' or 'I think.'" *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 990 (W.D. Wisc. 2003). "A reasonable investor could find statements significant even if they are not made with absolute certainty." *Id.*; *see also Mulligan*, 36 F. Supp. 3d at 967 ("that certain statements are predicated with indications that the speaker thought or believed a given statement" does not change the fact that the statements "contain factual representations at their core"); *City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132 (CM) (THK), 2013 WL 1197755, at *14 (S.D.N.Y. Mar. 23, 2013) (holding that statements that "[w]e feel very good about the product going forward" and "we have also been very excited about some of the fashion components . . . for spring" are actionable); *In re Discovery Labs. Sec. Litig.*, No. 06-1820, 2006 WL 3227767, at *15 (E.D. Pa. Nov. 1, 2006) ("Defendants seem to ask us to find that the mere inclusion of a word such as 'believe' or 'might' is sufficient to create a general statement of optimism. We disagree.").[8]

---

[8]     Finally, Defendants' argument raises an issue of fact that courts have refused to resolve at the pleading stage. *See, e.g.*, *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 250 n.11 (D. Mass. 2006) ("dismissals on this ground are increasingly rare"); *In re Vivendi Universal, S.A.*,

### 4. The PSLRA's Safe Harbor Provision Does Not Protect Defendants' False and Misleading Statements

The safe harbor provision of the PSLRA does not insulate Defendants' false and misleading statements. 15 U.S.C. §78u-5(c). "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 247 (2d Cir. 2016). Accordingly, "[v]ague disclaimers are inadequate." *Id*. Defendants, moreover, "carry the burden of demonstrating that they are protected by the meaningful cautionary language prong of the safe harbor . . . ." *Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010); *Vivendi*, 838 F.3d at 247.

### (a) The Safe Harbor Provision Does Not Apply to Defendants' Misstatements of Current or Historical Facts

The PSLRA's safe harbor provision does not apply to Defendants' statements of current or historical fact. Indeed, the "misrepresentation of present or historical facts cannot be cured by cautionary language." *P. Stolz Family Partnership L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004). Additionally, "a statement may contain some elements that look forward and others that do not, and forward-looking elements may be severable from non-forward-looking elements." *Vivendi*, 838 F.3d at 246 (2d Cir. 2016).

Defendants cite two misstatements to argue that the statements are forward-looking: (1) "we are now leveraging a stronger foundation to execute into 2019 and beyond" ¶35; and (2) "we're on the right track towards building a business that can deliver improved revenue growth with expanding margins over time." ¶36; Motion at 14. Defendants fail to recognize however,

---

381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003) ("Whether the opinion or 'soft information' is indeed actionable depends on all relevant circumstances of the particular case, and is generally not an appropriate basis on which to dismiss a complaint at this stage of the action.").

that the "safe harbor provision does not apply to any allegedly false statement that has both a forward-looking aspect and an aspect that encompasses a representation of present fact." *In re Salix Pharm., Ltd.*, No. 14-CV-8925 (KMW), 2016 WL 1629341, at *9 (S.D.N.Y. Apr. 22, 2016). Indeed, Defendants' representations that "*we are now leveraging* a stronger foundation" and "*we're on the right track*" – which are stated in the present tense – indicate that Defendants' statements related to the *current* status of the Company's operations.[9] As courts in this district have reasoned in rejecting identical arguments made by defendants, "[m]any of the alleged misstatements are not forward-looking because they either state a present or historical fact alone or incorporate forward-looking aspects into statements of present or historical fact." *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 478 (S.D.N.Y. 2010); *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, No. 11 CIV. 3658, 2012 WL 2512280, at *9 n.141 (S.D.N.Y. June 29, 2012). "It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language." *P. Stolz*, 355 F.3d at 97.

### (b)    The PSLRA's Safe Harbor Provision Does Not Apply to Defendants' Omissions

The PSLRA's safe harbor provision is also inapplicable because it does not apply to Defendants' omissions. As numerous courts have declared, "the safe harbor does not apply to material omissions." *Aeropostale*, 2013 WL 1197755, at *12; *see also Salix*, 2016 WL 1629341,

---

[9]    *See, e.g.*, *Bielousov*, 2017 WL 3168522, at *5 (statement that "[w]e believe we're still on track" to make the company's revenue guidance "is not forward-looking, and therefore is not covered by the PSLRA safe harbor provision"); *Murphy*, 2017 WL 3084274, at *13 (statements that the company was "on track" were statements of current business conditions and not forward-looking); *Rihn*, 2016 WL 5076147, at *6 ("Defendants' 'on track' assurances were representations about the *current* state of affairs") (italics in original); *Mulligan*, 36 F. Supp. 3d at 964 (holding that statements that the company was "on track" are not forward-looking because they relate to current conditions); *Secure*, 184 F. Supp. 2d at 990-91 (holding that statements that the company was "on track to meet its financial goals" represented "statements of current business conditions" that "were not forward-looking").

at *9 ("The safe harbor also does not protect material omissions."); *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 35 (S.D.N.Y. 2004) (holding that the safe harbor provision does not apply "to material omissions or misstatements of historical fact").  Because Plaintiff alleges that Defendants failed to disclose that the Company's Board sought to implement a strategy based upon cuts and cost-control measures that CEO Wiener and President Hofstetter believed would compromise ComScore's long-term goal to establish a cross-platform measurement currency. (¶¶43-46), the PSLRA's safe harbor provision does not apply to these material omissions.

> ### (c) The Company's Generalized Disclaimers Were Ineffective Because They Warned of Risks that Had Already Materialized and Were of Greater Magnitude Than Defendants Portrayed

Defendants' generalized disclaimers are also ineffective because they failed to warn investors that the risks alleged had already materialized and were of greater magnitude than portrayed. "Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."  *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004); *Freudenberg v. E\*Trade Financial Corp.*, 712 F. Supp. 2d 171, 193 (S.D.N.Y. 2010).  The safe harbor provision provides no protection to one who warns "there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away."  *Rombach*, 355 F.3d at 173.

Although Defendants suggest that ComScore adequately warned investors with disclaimers such as "the failure to integrate new personnel ***could*** harm our business," "we ***may*** encounter difficulties managing our costs, which could adversely affect our results of operations," and we "***may*** incur significant net losses in the future and may not achieve profitability" (Motion at 15-16), ComScore failed to disclose that the disagreement between CEO Wiener and President Hofstetter and the Company's Board was not a mere possibility, but existed at the time they made their false and misleading statements – and, indeed, had existed ***for***

17

*months*.  ¶44.  These disclaimers, moreover, were generalized, broad disclaimers that failed to "alert investors to the specific risks they are facing."  *Salix*, 2016 WL 1629341, at *11; *Lockheed*, 875 F. Supp. 2d at 365.  For example, ComScore's disclaimer that "we may fail to meet or exceed the expectations of securities analysts or investors, which could cause or stock price to decline" (Motion at 16) is inadequate because it "provided no company-specific information" and can apply to any public company in the world.  *Sgalambo*, 739 F. Supp. 2d at 478-79.  Thus, Defendants' argument fails.

> **(d)    Plaintiff Adequately Alleges that Defendants Had Actual Knowledge that Their Non-Forward-Looking Statements Were False and Misleading**

The PSLRA's safe harbor provision also does not protect forward-looking statements if the speaker had actual knowledge that the statements were false or misleading.  15 U.S.C. §78u–5(c)(1)(B)(i).  Plaintiff, in fact, alleges that the disagreement between CEO Wiener and President Hofstetter and the Company's Board existed at the time they made their false and misleading statements and had existed for months.  ¶44.  Thus, contrary to Defendants' assertion (Motion at 16), Plaintiff has adequately alleged that at the time Defendants made their statements and issued guidance for the Company, they knew such statements lacked a reasonable basis because of this fundamental disagreement, and that such statements were thereby false and misleading.  ¶¶43-46.

> **(e)    Because Reasonable Minds Can Disagree Regarding the Misleading Nature of Defendants' Representations, Dismissal Under the Safe Harbor Defense is Unwarranted**

Finally, dismissal under the safe harbor defense "requires a stringent showing" by Defendants.  *In re Atossa Genetics Inc. Sec. Litig*., 868 F.3d 784, 798 (9th Cir. 2017).  "There must be sufficient cautionary language or risk disclosure such that reasonable minds could not disagree that the challenged statements were not misleading."  *Id*.; *Lormand*, 565 F.3d at 248; *Slayton*, 604 F.3d at 771 n.8.  The application of the safe harbor provision is not so obvious as to

18

be decided as a matter of law. *Illinois State Bd. of Inv. v. Authentidate Holding Corp.*, 369 F. App'x 260, 264-65 (2d Cir. 2010).

## B.    Plaintiff Adequately Alleges that Defendants Acted with Scienter

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."   15 U.S.C. §78u-4(b)(2); *Tellabs*, 551 U.S. at 314.   Importantly, "courts must consider the complaint in its entirety . . . [t]he inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323 (emphasis in original); *Slayton*, 604 F.3d at 766.  A strong inference of scienter arises if, "[w]hen the allegations are accepted as true and taken collectively," a "reasonable person would deem the inference of scienter at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324-26.  "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking gun genre, or even the most plausible of competing inferences" – the inference need only be equally plausible to as non-culpable inference.  *Id.* at 324.  Moreover, "at the motion to dismiss stage, a tie on scienter goes to the plaintiff."  *Lockheed*, 875 F. Supp. 2d at 372.

In the Second Circuit, plaintiffs may establish scienter in one of two ways: "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious behavior or recklessness."  *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).  "Either set of allegations will suffice to satisfy the necessary scienter element of a securities fraud claim."  *Stevelman v. Alias Research Inc.*, 174 F. 3d 79, 84 (2d Cir. 1999).  Plaintiff has adequately alleged facts that

19

constitute strong circumstantial evidence of conscious behavior or recklessness.[10]

### 1. Because the Facts Alleged Relate to the Company's Core Operations, They Support a Strong Inference of Scienter

The facts alleged support a strong inference of scienter because they relate to the core operations of the Company. "Under the core operations theory, a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue." *Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37–38 (S.D.N.Y. 2019); *see also Salix*, 2016 WL 1629341, at *16 ("the fact that [the alleged fraud] involved the core operations of [the company's] business also support[s] a strong inference of scienter"); *In re Fairway Grp. Holding Corp. Sec. Litig.*, No. 14 CIV. 0950 LAK, 2015 WL 249508, at *15 (S.D.N.Y. Jan. 20, 2015) (finding a strong inference of scienter where plaintiff "alleges that defendants' misstatements concerned a core operation of their company"); *Freudenberg*, 712 F. Supp. 2d at 201 (holding that because "the misstatements concerned [the company's] core operations" such facts supported a strong inference of scienter).

Here, there is no dispute that Plaintiff's allegations concern the Company's core operations. ¶¶43-46**.** Indeed, analysts and investors were keenly focused upon Defendants' optimistic statements regarding the prospects of the Company's growth and ComScore's long-term strategy to establish a cross-platform measurement currency. *See, e.g.*, ¶¶38. Defendants, moreover, admit that "developing a cross-platform measurement currency" is "at the core of Comscore's business . . . ." Motion at 11. Accordingly, "[t]he fact that revenues and other

---

[10] Defendants suggest that the lack of an alleged motive undermines Plaintiff's Complaint. Motion at 18-19. The Supreme Court has repeatedly declared, however, that the "absence of a motive allegation" is "not dispositive." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011); *see also Tellabs*, 551 U.S. at 325 ("the absence of a motive allegation is not fatal").

related metrics were key to measuring [ComScore's] financial performance and [were] a subject about which investors and analysts often inquired further reinforces the inference of scienter." *comScore*, 268 F. Supp. 3d at 553.

### 2. The Confidential Witness Adds to the Strong Inference of Scienter Alleged

Plaintiff has also adequately alleged facts that constitute strong circumstantial evidence of conscious behavior or recklessness based upon information from a confidential witness. Information from confidential witnesses can be relied upon "provided [the confidential witnesses] are described . . . with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314; *Freudenberg*, 712 F. Supp. 2d at 196.

Such is the case here. For instance, Confidential Witness ("CW")1 provides information that confirms that the Company's Board sought to implement a strategy based upon cuts that CEO Wiener and President Hofstetter believed would compromise the Company's long-term goal to establish a cross-platform measurement currency. ¶46. CW1 served as a Senior Director of Product Management at ComScore from March 2006 to July 2019. *Id*. CW1 stated that no one at ComScore was in charge of the data strategy for the Company. *Id*. Specifically, CW1 stated that with respect to ComScore's Campaign Ratings, the Company's rollout was delayed because ComScore was having difficulties getting parties to implement the measurement. *Id*. CW1 stated that if ComScore wanted to implement a new metric, third parties, such as Hulu, would have to provide the data, which was a difficult task in many respects. *Id*. CW1 also stated that ComScore faced a myriad of issues with data rights that had to be addressed on a client-by-client basis. *Id*. Thus, according to CW1, ComScore had to work out agreements with parties such as ATT, Comcast, and Twitch regarding carriage issues and other details that required a

great deal of attention and work. *Id.* These allegations, therefore, "constitute adequate allegations of scienter." *Freudenberg*, 712 F. Supp. 2d at 197.

### 3. The Departures of Several Key Company Executives Near the Time of the Company's Revelations Support a Strong Inference of Scienter

Coupled with the other allegations of scienter, the departures of several of the Company's key executives also bolster the strong inference of scienter alleged. *See, e.g.*, *comScore*, 268 F. Supp. 3d at 553 ("The timing and circumstances surrounding the resignations . . . also contribute to the inference of scienter"); *Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012) (holding that defendant's resignation to "pursue another professional opportunity adds to the inference of scienter" because the timing of the resignation coincided with the company's release of negative information). Here, CEO Wiener and President Hofstetter both resigned at the same time that the Company announced that it expected first quarter 2019 revenue to be between $100 million and $104 million, falling short of analysts' estimates of approximately $106 million in revenue. ¶48. Additionally, in June, "the company's chief product officer Dan Hess left the company, as did svp Naresh Rekhi. Since then svp of TV and cross-platform products Kendall McMahon has also left the company." ¶45. On August 14, "the same day the Xandr deal was announced, Comscore announced that Paul Reilly — one of the board members who is said to have been among those clamoring for cuts — was resigning his seat." *Id.* These resignations "although not sufficient in and of themselves, add to the overall pleading of circumstantial evidence of fraud." *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007).

"The inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-22 (italics in original). Under this standard, Plaintiff has

22

adequately alleged scienter.

### C.        Plaintiff Adequately Alleges Loss Causation

The PSLRA provides that "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged . . . caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. §78u-4(b)(4).  To adequately plead loss causation, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  In the Second Circuit, a plaintiff can adequately plead loss causation by alleging "a corrective disclosure of the fraud" or a "materialization of the risk concealed by the fraudulent statement."  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173-75 (2d Cir. 2005).  Plaintiff's burden of adequately pleading loss causation "is not a heavy one." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015).

Plaintiff has adequately alleged loss causation under both a corrective-disclosure theory and a materialization-of-the-risk theory.  Specifically, Plaintiff alleges that ComScore concealed the fact that the Company's Board sought to implement a strategy based upon cuts and cost-control measures that CEO Wiener and President Hofstetter believed would compromise ComScore's long-term goal to establish a cross-platform measurement currency.  ¶¶2, 43-46. Plaintiff further alleges that as a result of this disagreement, the concealment of this risk partially materialized on March 31, 2019, when the Company announced the resignations of CEO Wiener and President Hofstetter and that it expected first quarter 2019 revenue to be between $100 million and $104 million, falling short of analysts' estimates.  ¶¶3, 48.  On this news, the Company's stock price fell $6.01 per share, or nearly 30%, to close at $14.24 per share on April 1, 2019, on unusually heavy trading volume. ¶¶4, 50.

Additionally, on May 8, 2019, ComScore announced the Company's financial results for the first quarter of 2019. ¶51.  The Company also announced that it "began implementing a reduction in force plan that, together with recent attrition, is expected to result in the termination of approximately 10% of the Company's workforce."  ¶52. Plaintiff further alleges these announcements were related to the disagreement between CEO Wiener and President Hofstetter and the Board because they "constituted partial corrective disclosures regarding the impact of Defendants' false and misleading statements regarding the Company's growth and long-term goal to establish a cross-platform measurement currency."  ¶54.  On this news, the Company's stock price declined to close at $11.34 on May 9, 2019. *Id.*

On August 6, 2019, ComScore announced its financial results for the second quarter of 2019, which were similarly related to the Company's long-term goal to establish a cross-platform measurement currency.  ¶57.  The Company's stock price closed on August 12, 2019 at $1.61 per share, down from its high of more than $23 per share on February 25, 2019, thereby causing substantial damage to investors.  ¶60.  These allegations provide Defendants "with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347.

Defendants raise three arguments claiming that Plaintiff has not adequately alleged loss causation: (1) "the alleged corrective disclosures in May 2019 did not reveal some then-undisclosed fact;" (2) the decline in ComScore's stock price began before the alleged corrective disclosures in May 2019 and as a result of missing analysts revenue targets; and (3) "the Complaint cannot link the alleged corrective disclosures in May 2019 to losses that occurred in August 2019."  Motion at 22-23.  Each of these arguments fail.

First, Defendants are advocating a fact-for-fact standard that conflicts with *Dura*.  *Dura*

24

did not confine the "relevant truth" to explicit identification of the earlier misrepresentations alleged. "Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, *or through events constructively disclosing the fraud*, does not alter the basic loss-causation calculus." *Vivendi*, 838 F.3d at 262. Second, Defendants' insistence that the "alleged corrective disclosures in May 2019 cannot have caused losses predating them by a month" (Motion at 22) is also meritless. Since *Dura* establishes that the relevant truth may "leak out" (*Dura*, 544 U.S. at 342), "loss causation may be pleaded on the theory that the truth gradually emerged through a series of partial disclosures and that an entire series of partial disclosures caused the stock price deflation." *Lormand*, 565 F.3d at 261 & n.31; *Freudenberg*, 712 F. Supp. 2d at 202. Finally, Defendants' argument that Plaintiff attempts to plead "slow-motion loss causation" (Motion at 23) is merely a different version of their previous argument, which also conflicts with *Dura*'s principle that the relevant truth may "leak out." *Dura*, 544 U.S. at 342. Thus, Plaintiff has adequately alleged loss causation.

### D.    Plaintiff Adequately Alleges Control Person Liability

Contrary to Defendants' assertion (Motion at 23-24) – and as demonstrated above – Plaintiff has adequately pled a primary violation, and has also sufficiently alleged the Individual Defendants' control over the Company. ¶¶12-14; 96-98. Thus, Plaintiff has adequately alleged a control person claim.

### V.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion. Alternatively, if the Court grants any portion of the Motion, Plaintiff respectfully requests leave to amend. *ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) ("courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b)").

25

Dated: January 13, 2020                          **GLANCY PRONGAY & MURRAY LLP**


                                                 By:  *s/ Ex Kano S. Sams II*
                                                 Lionel Z. Glancy
                                                 Robert V. Prongay
                                                 Ex Kano S. Sams II
                                                 Charles H. Linehan
                                                 Pavithra Rajesh
                                                 1925 Century Park East, Suite 2100
                                                 Los Angeles, CA 90067
                                                 Telephone:  (310) 201-9150
                                                 Facsimile:   (310) 201-9160
                                                 Email:  esams@glancylaw.com

                                                 *Attorneys for Lead Plaintiff and the Class*

26

## PROOF OF SERVICE

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On January 13, 2020, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 13, 2020.

*s/ Ex Kano S. Sams II*
Ex Kano S. Sams II