UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SERGII BRATUSOV, *individually and on behalf of all others similarly situated,*

                                  Plaintiff,

                    -v.-

COMSCORE, INC., BRYAN WIENER, and
GREGORY A. FINK,

                                  Defendants.

19 Civ. 3210 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Sergii Bratusov, on behalf of himself and other similarly situated shareholders, brings this securities class action against Defendants Comscore, Inc. ("Comscore" or the "Company"),[1] and Comscore executives Bryan Wiener and Gregory A. Fink (together, the "Individual Defendants," and with Comscore, "Defendants"). Plaintiff alleges that he and other putative class members suffered losses when Defendants made false and misleading statements regarding the Company's growth and its long-term strategy to establish a cross-platform measurement currency. Plaintiff has brought securities fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Defendants have moved to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 9(b) and

---

[1]     The Court observes that the Company's name is presented in various documents as "Comscore," "ComScore," and "comScore." It adopts the first variation for ease of reference.

12(b)(6) for failure to state a claim.  For the reasons that follow, the Court
grants Defendants' motion to dismiss.

## BACKGROUND[2]

### A.    Factual Background

Comscore is an information and analytics company that creates products
by combining information about content and advertising consumption on
digital platforms, televisions, and movie screens with demographics and other
descriptive information.  (Compl. ¶¶ 2, 15).  At all relevant times, Bryan Wiener
was the Chief Executive Officer ("CEO") and Gregory A. Fink was the Chief
Financial Officer ("CFO") of Comscore.  (*Id.* at ¶¶ 12-13).

Plaintiff is an investor in Comscore, having purchased Comscore
securities on March 26, 2019.  (Dkt. #14-2, 14-3; Compl. ¶¶ 1, 10).  He
represents a putative class of persons and entities that purchased or otherwise
acquired Comscore securities between February 28, 2019, and August 7, 2019,
inclusive (the "Class Period").  (Compl. ¶ 1; *see also id.* at ¶¶ 61-66).

---

[2]    The facts in this Opinion are drawn primarily from Plaintiff's Amended Complaint
("Complaint" or "Compl." (Dkt. #27)), which is the operative pleading in this case, and
the Declaration of Clifford Thau ("Thau Decl." (Dkt. #31)) and attached exhibits.  The
documents attached to the Thau Declaration are documents that have been publicly
filed with the United States Securities and Exchange Commission (the "SEC").  *See
Tongue* v. *Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016) ("The Court may [] consider any
written instrument attached to the complaint, statements or documents incorporated
into the complaint by reference, legally required public disclosure documents filed with
the SEC, and documents possessed by or known to the plaintiff upon which it relied in
bringing the suit." (internal quotation marks omitted)).

For ease of reference, the Court refers to Defendants' opening brief as "Def. Br." (Dkt.
#32); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #35); and Defendants' reply brief as
"Def. Reply" (Dkt. #36).

Plaintiff alleges that, throughout the Class Period, there was a fundamental disagreement between Comscore's executives and the Company's Board of Directors (the "Board") regarding the strategy and direction of the Company.  (Compl. ¶ 2).  Comscore's executives — in particular CEO Wiener and President Sarah Hofstetter — sought to implement "a strategy based on the Company's growth" to establish a cross-platform measurement currency for the Company.  (*Id.*).[3]  For its part, the Board sought to implement a strategy based on cuts and cost-control measures, though Weiner and Hofstetter believed that such a strategy would compromise Comscore's long-term goal of establishing a cross-platform measurement currency.  (*Id.*).  Accordingly, Plaintiff alleges, "Defendants falsely represented that Comscore was focused upon revenue growth to establish a cross-platform measurement currency when they knew that the Company's Board insisted upon cost-control measures that undermined revenue growth and the implementation of a cross-platform measurement currency."  (Pl. Opp. 3; *see also* Compl. ¶ 2).

Plaintiff alleges that the fraudulent representations began on February 28, 2019, when Comscore announced the Company's fourth quarter and full year 2018 financial results.  (Compl. ¶ 35).  *First*, Plaintiff excerpts the following text from a statement made by CEO Wiener:

---

[3]     Establishing a currency for cross-platform measurement refers to Comscore's goal of "combin[ing] information about content and advertising consumption on digital platforms (smartphones, tablets and computers), television [] and movie screens with demographics," thereby "help[ing] companies across the media ecosystem better understand and monetize their audiences.  (Thau Decl., Ex. 1 (Comscore, Inc., Annual Report at 1 (Form 10-K) (March 1, 2019)).

> In the fourth quarter, we continued to expand our customer relationships, drive revenue growth, and improve our cost structure while investing in product development, resulting in our fourth straight quarter of positive adjusted EBITDA. We continue to benefit from shifts in the media landscape that demand a better solution and currency for measuring media across platforms. 2018 was a meaningful step forward in the transformation of Comscore, and we are now leveraging a stronger foundation to execute into 2019 and beyond.

(*Id.* (emphasis omitted) (the "First Alleged Misstatement")).

*Second*, Plaintiff cites the following statement from Wiener during the February 28, 2019 conference call following the release of Comscore's fourth quarter and full-year 2018 results:

> The headline today is our strategy of becoming a trusted currency for planning, transacting[,] and evaluating media cross-platforms is working. ... While we are not declaring victory, we do believe today's report is yet another proof point that we're on the right track towards building a business that can deliver improved revenue growth with expanding margins over time. Revenue in Q4 exceed[ed] our expectations due to a strong selling quarter as well as excellent delivery on our solutions.

(Compl. ¶ 36 (emphasis omitted) (the "Second Alleged Misstatement")).

*Third*, Plaintiff cites a statement by Wiener during the same conference call that, "[f]or 2019, we anticipate mid-single digit revenue growth, a slight improvement in gross margins over 2018 and generally flat non-GAAP operating expenses relative to 2018. We expect our adjusted EBITDA margin will expand in the second half of the year and come in at mid-single digits for the year." (Compl. ¶ 37 (the "Third Alleged Misstatement")).

Plaintiff alleges that, despite these rosy representations, internal discord reigned between Comscore executives and its Board — a discord that

4

Defendants pointedly failed to disclose.  (Compl. ¶ 43).  Matters came to a head on or about March 31, 2019, when the Company announced the resignations of Wiener and Hofstetter (the "Departing Executives"), both of whom had been appointed to their positions less than one year earlier.  (*Id.* at ¶ 48).  An April 2, 2019 Digiday article entitled "'They were bringing back that integrity': Comscore's leadership shakeup concerns media partners," stated that "CEO Bryan Wiener and president Sarah Hofstetter jointly resigned over the weekend, following a disagreement with the board on the company's direction." (*Id.* at ¶ 44).  The article stated further that "[w]hile Wiener painted a vision for a multichannel measurement company and wanted to invest more in product development, board members were largely risk-averse and pushed for ways to slim down the business, said a source familiar with the matter."  (*Id.*).  The article reported that the source indicated "this tension had existed for months." (*Id.*).  According to Plaintiff, during this same period of tension, analysts and investors were keenly focused on (if not misled by) Defendants' optimistic statements regarding the prospects for the Company's growth and its long-term strategy to establish a cross-platform measurement currency.  (*Id.* at ¶¶ 38-42).[4]

Defendant Wiener acknowledged this disagreement when he posted the following on his LinkedIn post: "I ultimately chose to leave as the Board and I had irreconcilable differences over how to execute the company's strategy."

---

[4]     Of potential significance to the instant motion, Plaintiff does not allege that Comscore ever abandoned its goal of creating a cross-platform measurement currency, even after the departure of Wiener and Hofstetter.  (*See generally* Compl.).

(Compl. ¶ 44).  A Comscore spokesperson confirmed the disagreement by stating that Wiener "disagreed with the company regarding the execution of the strategy." (*Id.*).  The same day that the Company announced the resignations,[5] it also announced that it expected the first quarter 2019 revenue to be between $100 and $104 million, falling short of analysts' estimates of approximately $106 million in revenue.  (*Id.* at ¶ 48).  On this news, the Company's share price fell $6.01 per share, or nearly 30%, to close at $14.24 per share on April 1, 2019, on unusually heavy trading volume.  (*Id.* at ¶ 50).

Plaintiff alleges that the Company began making partial corrective disclosures on May 8, 2019.  (Compl. ¶ 54).  On that date, Comscore issued a press release on the Company's financial results for the first quarter of 2019 that, among other things, announced a 3.4% year-over-year revenue decline, and an adjusted EBITDA loss of $2.5 million compared to positive $3.6 million for the first quarter of 2018.  (*Id.* at ¶ 51).  The press release stated in part:

> "Over the past five weeks, we began a strategic review of the company, including all aspects of customer relationships, products, and organization structure," [Dale] Fuller [Comscore's director and interim CEO] added.  "While the strategic review is still in process, we have identified and implemented actions this week that we believe will result in a better customer experience, improved organizational efficiency, and resources that are better aligned with business needs.  We expect these actions to decrease our annualized costs and cash outflow by approximately $20 million, or 5% of our core operating costs, a portion of which will be realized beginning in the second quarter of 2019."

---

[5]     On April 1, 2019, the Company filed a Form 8-K with the SEC elaborating that Defendant Wiener had resigned because he "disagreed with the Company regarding the execution of [its] strategy." (Compl. ¶ 49).

(*Id.*).  The Company also filed a Form 8-K with the SEC on May 8, 2019, in which it stated:

> On May 7, 2019, the Company began implementing a reduction in force plan that, together with recent attrition, is expected to result in the termination of approximately 10% of the Company's workforce.  The reduction in force is being implemented in order to enable the Company to decrease its costs and more effectively align resources to business priorities....

(*Id.* at ¶ 52).

Also on May 8, 2019, Comscore held a conference call to discuss the Company's financial results for the first quarter of 2019.  (Compl. ¶ 53).  Fuller and Defendant Fink participated in the call.  (*Id.*).  During the conference call, the Company stated that "we took steps yesterday to reduce our workforce by approximately 10%, which includes open positions that will not be filled."  (*Id.*).  The Company refused to provide further guidance, stating that "[a]s for the year, we will update our revenue guidance when we have better clarity on the financial impact of the revised operating plan."  (*Id.*).  On the news released on May 8, 2019, the Company's stock price declined to close at $11.34 on May 9, 2019.  (*Id.* at ¶ 54).

On August 6, 2019, Comscore issued a press release announcing its financial results for the second quarter of 2019.  (Compl. ¶ 57).  Specifically, the Company stated that:

> "In the second quarter, we took significant steps to better prioritize, refocus and invest in our product portfolio, and provide our customers with innovative technologies and services which we believe will drive us to a position of profitability and growth faster and more

efficiently," said Dale Fuller, director and interim chief executive officer of Comscore. "Additionally, we reduced core operating costs in the quarter, which provided greater financial flexibility as we seek to maximize our resources. The management team is exploring all aspects of the business and is conducting a comprehensive strategic review of all our options, making sure that our talent is focused on developing compelling products that our customers want and need. We believe this approach should ultimately allow us to generate break-even to positive operating cash flow later this year."

(*Id.*). Also on August 6, 2019, Comscore held a conference call to discuss the Company's financial results for the second quarter of 2019. (*Id.* at ¶ 58). Interim CEO Fuller and Fink participated in the call. (*Id.*). During the conference call, the Company stated that "we reported Q2 revenue of $96.9 million, which compares to revenue of $101.4 million reported in the second quarter of last year and $102.3 million in the first quarter." (*Id.*). Comscore stated further that "[r]evenue from Ratings and Planning in the second quarter was $68.9 million, a decrease of $1.6 million from the prior-year quarter." (*Id.*). Based on this news, analysts lowered their revenue and EBITDA forecasts for Comscore. (*Id.* at ¶ 59).

On August 12, 2019, Board member Paul Reilly resigned, stating in his resignation letter that "I do not believe the Company's go-forward operating strategy, in general, is progressing fast enough and specifically in innovation and development." (Compl. ¶ 45). The Company's stock price closed on August 12, 2019, at $1.61 per share, down from its high of more than $23 per share on February 25, 2019. (*Id.* at ¶ 60).

8

B.      **Procedural History**

Plaintiff filed the original complaint in this action, styled as a putative class action, on April 10, 2019.  (Dkt. #1).  On April 12, 2019, the Court ordered Plaintiff to comply with the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(a)(3)(A), which requires that Plaintiff publish a notice advising members of the purported class of the action.  (*See* Dkt. #5).  On April 29, 2019, Plaintiff docketed the notice he had published via Business Wire on April 10, 2019, advising members of the purported class of the pendency of this action.  (Dkt. #6).

On May 2, 2019, the Court issued an order stating that the members of the purported class had until June 10, 2019, to move the Court to serve as lead plaintiff.  (Dkt. #7).  Plaintiff was the only class member who moved to serve as lead plaintiff (*see* Dkt. #12-14), and his motion was unopposed (*see* Dkt. #18).  On July 26, 2019, the Court appointed Plaintiff as lead plaintiff and appointed his counsel, Glancy Prongay & Murray LLP, as interim class counsel. (Dkt. #21).

On August 5, 2019, the Court entered a scheduling order.  (Dkt. #26). Plaintiff subsequently filed the Complaint on September 30, 2019.  (Dkt. #27). On October 25, 2019, Defendants filed a letter seeking leave to file a motion to dismiss the Complaint.  (Dkt. #28).  The Court set a briefing schedule for Defendants' motion to dismiss the same day.  (Dkt. #29).

Defendants filed a motion to dismiss and supporting declaration on November 25, 2019.  (Dkt. #30-32).  Plaintiff filed a brief in opposition to the

9

motion on January 13, 2020. (Dkt. #35). Defendants filed a reply brief on January 27, 2020. (Dkt. #36). Accordingly, the motion is now fully briefed.

## DISCUSSION

### A. The Court Grants Defendants' Motion to Dismiss

#### 1. Applicable Law

##### a. Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

When considering a motion to dismiss under Rule 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).

"While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [a plaintiff's] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (quoting *Twombly*, 550 U.S. at 570). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Moreover,

"the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

> ### b.     Securities Fraud Under § 10(b), Rule 10b-5, and § 20(a)

Under Section 10(b) of the Exchange Act, it is

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.  Rule 10b-5, promulgated by the SEC under Section 10(b), further provides that a person may not

> employ any device, scheme, or artifice to defraud[;] ... make any untrue statement of a material fact or ... omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[;] or ... engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[;] in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  "Although Section 10(b) does not expressly provide for a private right of action, courts have long recognized an implied private right of action under Section 10(b) and Rule 10b-5."  *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 939 F. Supp. 2d 360, 376 (S.D.N.Y. 2013) (citing *Superintendent of Ins.* v.

11

*Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971) ("It is now established that a private right of action is implied under [Section] 10(b).")).

To prevail on a Section 10(b) or a Rule 10b-5 claim, a plaintiff must prove "'[i] a material misrepresentation or omission by the defendant; [ii] scienter; [iii] a connection between the misrepresentation or omission and the purchase or sale of a security; [iv] reliance upon the misrepresentation or omission; [v] economic loss; and [vi] loss causation.'" *GAMCO Inv'rs, Inc.* v. *Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (quoting *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)).  Such claims are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA, 15 U.S.C. § 78u-4(b).  *See, e.g.*, *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (affirming that securities fraud claims must satisfy the heightened pleading standards of both Rule 9(b) and the PSLRA); *Arco Capital Corp.* v. *Deutsche Bank AG*, 949 F. Supp. 2d 532, 539 (S.D.N.Y. 2013) (same).

Under Rule 9(b), a plaintiff must "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  This requires that a plaintiff's complaint: "'[i] specify the statements that the plaintiff contends were fraudulent, [ii] identify the speaker, [iii] state where and when the statements were made, and [iv] explain why the statements were fraudulent.'"  *Rombach* v. *Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting *Mills* v. *Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  In contrast, "intent, knowledge, and other

conditions of mind may be averred generally." *Kalnit* v. *Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting Fed. R. Civ. P. 9(b)).

Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under [the Exchange Act and its implementing regulations] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." 15 U.S.C. § 78t(a). A claim under § 20(a) is thus dependent on the validity of an underlying securities violation. Indeed, to establish control-person liability, a plaintiff must show [i] "a primary violation by the controlled person"; [ii] "control of the primary violator by the defendant"; and [iii] that the controlling person "was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc.*, 493 F.3d at 108.

### c.   The Challenged Elements of Plaintiff's Securities Fraud Claim

Defendants' motion challenges the adequacy of Plaintiff's pleading of three elements of his securities fraud claims: (i) a material misrepresentation or omission; (ii) scienter; and (iii) loss causation. The Court discusses the first two of these elements below, as they prove dispositive of the claims at issue. It discusses the relevant legal standards here.

### i.   Material Misrepresentations or Omissions

Rule 10b-5 prohibits "mak[ing] any untrue statement of a material fact" or "omit[ting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not

misleading." 17 C.F.R. § 240.10b-5(b). "A statement is misleading if a reasonable investor would have received a false impression from the statement." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017) (quoting *Freudenberg* v. *E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010)). "The 'veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers.'" *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 472 (S.D.N.Y. 2017) (quoting *Kleinman* v. *Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013)).

"Section 10 'do[es] not create an affirmative duty to disclose any and all material information.'" *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d at 472 (quoting *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 44 (2011)). "Thus, generally, 'an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts.'" *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d at 609 (quoting *Stratte-McClure* v. *Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015)). "A duty to disclose under Rule 10b-5 may arise 'when there is a corporate insider trad[ing] on confidential information, a statute or regulation requiring disclosure, or a corporate statement that would otherwise be inaccurate, incomplete, or misleading.'" *Id.* (alteration in original) (quoting *Stratte-McClure*, 776 F.3d at 101).

Even where a company is not under a duty to disclose, however, once it "chooses to speak, it has a 'duty to be both accurate and complete.'" *Sharette*

v. *Credit Suisse Int'l*, 127 F. Supp. 3d 60, 78-79 (S.D.N.Y. 2015) (quoting *Plumbers' Union Local No. 12 Pension Fund* v. *Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 180 (S.D.N.Y. 2010). This obligation only extends, however, to facts necessary to render "what was revealed [to] not be so incomplete as to mislead." *Richman* v. *Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 273 (S.D.N.Y. 2012) (quoting *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008)). Indeed, a company need not "accuse itself of wrongdoing," nor disclose an ongoing investigation, where the failure to do so would not make the company's statements misleading. *Id.* (quoting *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004)); *see also Menaldi* v. *Och-Ziff Capital Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 511 (S.D.N.Y. 2017) ("For such a duty [to disclose uncharged wrongdoing] to arise, ... there must be a connection between the illegal conduct and the misleading statements beyond the simple fact that a criminal conviction would have an adverse impact upon the corporation's operations in general or the bottom line." (quoting *Menaldi* v. *Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 581 (S.D.N.Y. 2016))).

To be actionable, a misstatement or omission must also be material, meaning that "a reasonable investor would have considered [it] significant in making investment decisions." *Heller* v. *Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 614 (S.D.N.Y. 2008) (quoting *Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000)). This is so where "there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the

reasonable investor as having significantly altered the total mix of information made available." *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 646 (S.D.N.Y. 2017) (quoting *ECA, Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009)).  "[W]hether an alleged misrepresentation is material necessarily depends on all relevant circumstances," and "[b]ecause materiality is a mixed question of law and fact, in the context of a Fed. R. Civ. P. 12(b)(6) motion, a complaint may not properly be dismissed … on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017) (last alteration in original) (quoting *ECA*, 553 F.3d at 197).

### ii.   Scienter

Under the PSLRA, "no defendant may be held liable for any … false or misleading statements unless [a] [p]laintiff has stated 'with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.'" *In re Banco Bradesco*, 277 F. Supp. 3d at 664 (quoting 15 U.S.C. § 78u-4(b)(2) (emphasis added)).  Scienter includes "a mental state embracing intent to deceive, manipulate, or defraud," or "recklessness." *Id.* at 664 (quoting *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *ECA*, 553 F.3d at 198).  A "strong inference" that a defendant acted with scienter need not be an irrefutable inference, though it "must be more than merely plausible or reasonable[.]" *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314

16

(2007).  It cannot be identified "in a vacuum," as "[t]he inquiry is inherently comparative[.]"  *Id.* at 323.  A "strong inference" is an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324.

To evaluate whether the PSLRA's standard has been met, courts consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs, Inc.*, 551 U.S. at 323 (emphasis in original); *see also id.* at 326 ("[The court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically. ... [A] court must ask:  When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?").  And "[w]hen the defendant is a corporate entity, ... the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  "Ascribing a state of mind to a corporate entity is a difficult and sometimes confusing task ... because the hierarchical and differentiated corporate structure often muddies the distinction between deliberate fraud and an unfortunate (yet unintentional) error caused by mere mismanagement."  *Jackson* v. *Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (internal quotation marks and citations omitted).

The facts pleaded ultimately (i) must show "that the defendants had the motive and opportunity to commit fraud" or (ii) constitute "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. "In order to raise a strong inference of scienter through 'motive and opportunity' to defraud, [a plaintiff] must allege that [defendants] 'benefitted in some *concrete and personal way* from the purported fraud.'" *Id.* (emphasis added) (quoting *Novak* v. *Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000)). It is not enough for a plaintiff to show "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation[.]" *Id.*; *accord, e.g.*, *Chill* v. *Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) ("[A] generalized motive ... which could be imputed to any publicly owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter.").

In the absence of a showing of motive, a plaintiff must plead conscious misbehavior or recklessness. Conscious recklessness is a "state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St., LLC* v. *Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quotation mark and emphasis omitted) (quoting *Novak*, 216 F.3d at 312). To plead conscious recklessness adequately, a plaintiff must allege facts showing "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendants or so obvious that the defendant must

18

have been aware of it." *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000); *accord Rothman* v. *Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (quoting *Rolf* v. *Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)). A plaintiff may allege that a defendant "engaged in deliberately illegal behavior, knew facts or had access to information suggesting his public statements were not accurate, or failed to check information that he had a duty to monitor." *Nathel* v. *Siegal*, 592 F. Supp. 2d 452, 464 (S.D.N.Y. 2008) (citing *Novak*, 216 F.3d at 311). Opinions or predictions can be the basis for scienter "if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) (citation omitted).

### 2.   Analysis

#### a.   Plaintiff Has Failed to Plead an Actionable Misstatement or Omission

Plaintiff contends that Comscore's alleged omission — *i.e.*, its non-disclosure of the business disagreement between the Company's management and the Board — rendered each of the Alleged Misstatements false or misleading. At a more granular level, Plaintiff argues *first*, that the Alleged Misstatements were false because while Comscore represented that it was focused upon revenue growth and the implementation of a cross-platform measurement currency, the Board sought to implement a strategy based on cuts and cost-control measures (*see* Pl. Opp. 8-11); and *second*, that the Alleged Misstatements were misleading such that Comscore had a duty to disclose the disagreement between the Company's management and its Board

19

(*see id.* at 11-12).  As set forth herein, even considered in its totality, the Complaint fails to state a claim as to any of the Alleged Misstatements.

### i. Plaintiff Has Failed to Allege That the Alleged Misstatements Were False

To begin, Plaintiff fails to allege falsity.  The First Alleged Misstatement is a statement by CEO Wiener that "[i]n the fourth quarter, we continued to expand our customer relationships, drive revenue growth, and improve our cost structure while investing in product development, resulting in our fourth straight quarter of positive adjusted EBITDA."  (Compl. ¶ 35).  He further stated that "we are now leveraging a stronger foundation to execute into 2019 and beyond."  (*Id.*).  Plaintiff points to nothing indicating that any of these factual assertions is untrue.  More to the point, the Complaint does not allege any reason why the proffered disagreement between the Board and management regarding the best means of implementing, on a going forward basis, a shared vision for a cross-platform measurement currency would render false *historical* statements by Comscore that it had expanded customer relationships, driven revenue growth, improved its cost structure, invested in product development, or built a strong foundation.

The Second Alleged Misstatement relates that Comscore's "strategy of becoming a trusted currency for planning, transacting and evaluating media cross-platforms is working," and that Comscore's fourth quarter and full year 2018 financial results are "another proof point that [Comscore is] on the right track towards building a business that can deliver improved revenue growth with expanding margins over time."  (Compl. ¶ 36).  Again, Plaintiff points to

nothing to show that Comscore's strategy was *not* "working," or that achieving the shared goal of a cross-platform measurement currency was *not* the "right track" towards delivering improved "revenue growth with expanding margins over time."

Further, much of the Second Alleged Misstatement is non-actionable puffery. As a general matter, statements of general corporate optimism cannot form the basis of a § 10(b) claim unless "they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund* v. *Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 392 (2d Cir. 2015). This is because "[t]o be material, within the meaning of § 10(b), the alleged misstatement must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome. *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014). Hence, statements of puffery are non-actionable when they are "too general to cause a reasonable investor to rely upon them." *ECA,* 553 F.3d at 206; *accord Kleinman* v. *Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013); *Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 F. App'x 32, 37 (2d Cir. 2012).

Statements analytically indistinct from the Second Alleged Misstatement have been repeatedly rejected by courts in this District as mere puffery. For example, in *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737 (S.D.N.Y. 2018), the district court held that statements that Aratana had "made

remarkable progress towards our stated goal of advancing our expanding pipeline towards commercialization"; that the company was "confident about and prepared for what lays ahead"; that Aratana was "proud" to be "on track to have these products reach the market in 2016"; and that it was "confident in these products and our overall commercialization strategy," constituted non-actionable puffery.  *Id.* at 757-58.  The court noted that "[s]uch statements do no more than place a positive spin on developments in the FDA approval process."  *Id.* at 758 (internal quotation marks omitted) (citing *In re EDAP TMS S.A. Sec. Litig.*, No. 14 Civ. 6069 (LGS), 2015 WL 5326166, at *9-10 (S.D.N.Y. Sept. 14, 2015) (finding that statements "indicat[ing] that the [FDA approval] process was 'on track' and making continued 'progress,'" or "declar[ing] defendants' belief that they were 'moving through the approval process in a timely manner,'" "constitute inactionable puffery"); *see also Rombach*, 355 F.3d at 174 ("Up to a point, companies must be permitted to operate with a hopeful outlook:  'People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.'" (quoting *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994))); *Lasker* v. *N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (statement that company's "business strategies would lead to continued prosperity" constitutes puffery).

Similarly, in *Schaffer* v. *Horizon Pharma LLC*, No. 16 Civ. 1763 (JMF), 2018 WL 481883 (S.D.N.Y. Jan. 18, 2018), the court held that statements "by

22

Defendants extolling their 'unique commercial business model' noting that the company was 'on track,' and highlighting that prescription growth was 'exceeding [their] expectations' are not actionable under the securities laws." *Id.* at *9 (internal citations omitted).  The court concluded that these statements were "too general to cause a reasonable investor to rely on them," and were indeed "textbook cases" of corporate puffery or optimism.  *Id.*[6]  This Court adopts their analyses, and thus rejects Plaintiff's arguments regarding the Second Alleged Misstatement.

The Third Alleged Misstatement is a statement by CEO Wiener that the Company "anticipated mid-single digit revenue growth, a slight improvement in gross margins over 2018 and generally flat non-GAAP operating expenses

---

[6]     Plaintiff does not distinguish these cases.  Rather, he cites *Manavazian* v. *Atec Grp.*, 160 F. Supp. 2d 468, 473-74 (E.D.N.Y. 2001), and *In re Vivendi Universal, S.A.*, No. 02 Civ. 5571 (RJH), 2004 WL 876050, at *7 (S.D.N.Y. Apr. 22, 2004), both of which are distinguishable.

In *Manavazian*, the court held that the statement that the company was "still on track" to maintain its revenue and growth earnings model was not puffery because "defendants knew that the industry's paradigm shift would require ATEC to make diversification and expansion efforts that would have a material negative impact on the Company's 1999 reported earnings."  *Id.* at 474 (internal quotation marks omitted).  That is, the defendants knew these statements were untrue because the paradigm shift they faced "hobbl[ed] the Company's basic health."  *Id.* at 480.  The court explained that "Defendants characterized ATEC's current and future business health in extremely positive terms, while they allegedly knew the contrary was true. ... [P]laintiffs allege more than mere expressions of general corporate optimism in light of recent history of significant earnings."  *Id.* at 481.

Similarly, in *Vivendi*, the defendants reported "very strong results" and expressed confidence that the company was "on track" to achieve earnings targets.  2004 WL 876050 at *7.  All the while, however, defendants were facing a "massive and crippling liquidity crisis."  *Id.* at *2.

The statements in *Manavazian* and *Vivendi* are far more specific than the generic "on track" statement here.  And Plaintiff does not allege that Defendants' optimism in Comscore's future was rendered false by an existential threat to the Company analogous to those facing Atec and Vivendi.

23

relative to 2018." Plaintiff points to nothing indicating that the Company disbelieved any aspect of this statement or that any aspect of the statement was false at the time it was made.

> **ii.   Plaintiff Has Failed to Allege That the Company Had a Duty to Reveal Disagreements Over Corporate Strategy**

The Alleged Misstatements are inadequate to support a claim of securities fraud, whether construed as false statements or as actionable omissions. In the latter regard, Plaintiff relies on *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259 (2d Cir. 1993), to argue that Comscore had a duty to disclose its internal business deliberations.[7] But *Time Warner* does not stand for such a broad proposition. As noted, silence absent a duty to disclose is not misleading. *Stratte-McClure*, 776 F.3d at 100-01. This general rule is in line with the Second Circuit's "reluctance to interpret the securities laws in a manner that requires companies to give competitors notice of proprietary strategies and information." *Id.* at 105. Nonetheless, a duty to disclose may arise when there is "a corporate insider trad[ing] on confidential information," a "statute or regulation requiring disclosure," or a corporate statement that would otherwise be "inaccurate, incomplete, or misleading." *Id.* at 101.

In *Time Warner*, the Second Circuit held that "when a corporation is pursuing a specific business goal and announces that goal as well as an

---

[7]   Plaintiff also cites *Lormand* v. *US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009), which is from outside this Circuit, and in any event does not stand for the proposition that issuers must disclose internal corporate disagreements. That case involved non-disclosure of an external business risk — *viz.*, subprime customers' inability to pay. *Id.* at 249.

intended approach for reaching it, it *may* come under an obligation to disclose other approaches to reaching the goal when those approaches are under active and serious consideration."  9 F.3d at 268 (emphasis added).  In *San Leandro Emergency Medical Group Profit Sharing Plan* v. *Philip Morris Co., Inc.*, 75 F.3d 801 (2d Cir. 1996), the Second Circuit, reflecting on *Time Warner*, stated that that case "went nearly to the outer limit of the line that separate[s] disclosable plans from plans that need not be disclosed[.]"  *Id.* at 810.  The Court further clarified that *Time Warner's* duty to disclose applied only in situations where (i) the company induced investors to believe that alternative business plans were excluded from consideration; and (ii) the company promised to maintain its business plan in the future, but nevertheless changed direction.  *Id.* at 810-11; *see also Friedman* v. *Endo Int'l PLC*, No. 16 Civ. 3912 (JMF), 2018 WL 446189, at *6 (S.D.N.Y. Jan. 16, 2018) ("It is equally well established that a company has no such duty to disclose changes to its business plans — unless the company had hyped a specific plan, thereby inducing investors to believe that alternative plans were excluded.  To qualify for that exception, a plaintiff must allege facts plausibly establishing that a company had stated its intention to adhere exclusively to a particular strategy and then changed its strategy without informing investors." (internal citations, quotation marks, and alterations omitted)).

    Plaintiff has alleged neither of those circumstances here.  The Alleged Misstatements themselves belie any argument that the Company had hyped a strategy of revenue growth to achieve its goal of establishing a cross-platform

measurement currency.  In the First Alleged Misstatement, Comscore stated that it had worked to improve its cost structure in the very same sentence in which it stated it had driven revenue growth in the fourth quarter of 2018. (*See* Compl. ¶ 35).[8]  Accordingly, it cannot be said that Comscore induced investors to believe it was working to drive revenue growth to the exclusion of improving its cost structure.

What is more, the Alleged Misstatements do not commit Comscore to a particular strategy for achieving its goal of creating a cross-platform measurement currency.[9]  A review of the Alleged Misstatements reveals that they merely assert that the Company was attempting to expand its business and capitalize on changes in the media landscape to increase revenue and expand margins over time.  *See Philip Morris*, 75 F.3d at 811 ("[S]tatements that plaintiffs contend gave rise to a duty to disclose Philip Morris' marketing plans … simply reflected company policy at the time; they were not promises to maintain that policy in the future, and thus [could not be] rendered misleading by the [C]ompany's subsequent consideration of an alternative plan.").  Importantly, Plaintiff does not allege that Comscore hyped its ability to achieve

---

[8]     The Second Alleged Misstatement says "While we are not declaring victory, we do believe today's report is yet another proof point that we're on the right track towards building a business that can deliver improved revenue growth and expanding margins over time." (Compl. ¶ 36).  This statement, which is qualified by the phrases "we are not declaring victory," "we're on the right track," and "over time," cannot be interpreted by a reasonable investor to hype a strategy of revenue growth.

[9]     To the extent that Plaintiff's argument is that the Alleged Misstatements are misleading because, behind the scenes, the Departing Executives and the Board disagreed over how much money to spend on developing the cross-platform measurement currency, Plaintiff's argument still fails.  None of the Alleged Misstatements committed Comscore to spending a particular amount of money or resources developing the cross-platform measurement currency.

its goal of creating a cross-platform measurement currency while knowing that the goal was not feasible or that the Company was secretly planning to abandon that goal.  Accordingly, Plaintiff has not shown that Comscore had a duty to reveal its internal business deliberations.

### iii.   Plaintiff Has Failed to Allege That the Alleged Misstatements Were Misleading

At bottom, Plaintiff fails to explain how a reasonable investor would have been misled by the Alleged Misstatements.  The totality of his argument is contained in a single paragraph in the Complaint:

> Contrary to Defendants' representations that the Company was focused on "driv[ing] revenue growth," that Comscore's "strategy of becoming a trusted currency for planning, transacting and evaluating media cross-platforms" was "working," and that the Company was "on the right track towards building a business that can deliver improved revenue growth with expanding margins over time," there was a fundamental disagreement that existed at the time between Comscore's executives and the Company's Board regarding the strategy and direction of the Company…. Accordingly, at the time Defendants made their statements and issued guidance for the Company, they knew such statements lacked a reasonable basis because of this fundamental disagreement, and that such statements were thereby false and misleading.

(Compl. ¶ 43 (internal alterations omitted)).  This cursory paragraph, which fails to explain *why* disclosure of an internal strategy disagreement was necessary in order to render the Alleged Misstatements not misleading, is legally insufficient to meet the standards of the PSLRA and Rule 9(b).  *See, e.g., Sjunde AP-Fonden* v. *Gen. Elec. Co.*, No. 17 Civ. 8457 (JMF), 2019 WL 4094559, at *16 (S.D.N.Y. Aug. 29, 2019) ("[N]either the Complaint nor Plaintiffs'

27

memorandum of law in opposition to Defendants' motion provides a basis for
*why* the revenue projections, without further disclosures, were misleading to a
reasonable investor."); *In re Tempur Sealy Int'l, Inc. Sec. Litig.*, No. 17 Civ. 2169
(LAK), 2019 WL 1368787, at *13 (S.D.N.Y. Mar. 26, 2019) ("Plaintiffs'
allegations that the press release and conference remarks were materially false
and misleading therefore are unsupported, conclusory, and insufficient to
survive this motion.").

Plaintiff's brief claims that the Board's strategy of cost control was
"diametrically opposed" to the strategy that Defendants publicly represented
and that the Company's implementation of a cost-cutting strategy "completely
undermined the revenue-growth strategy that Defendants touted to investors."
(Pl. Opp. 10-11).  That argument is entirely unsupported by the allegations in
the Complaint.  Plaintiff pleads no facts to show that an effort to control costs
conflicted with improving revenue growth and/or expanding margins over time.
Comscore disclosures cited in the Complaint confirm that the two efforts
existed in tandem.  (*See, e.g.,* Compl. ¶ 35 ("In the fourth quarter, we continued
to expand our customer relationships, *drive revenue growth*, and *improve our
cost structure* while investing in product development, resulting in our fourth
straight quarter of positive adjusted EBITDA." (emphases added))).  There is
nothing inherently implausible about a company attempting to leverage
resources and cut costs while simultaneously attempting to drive revenue
growth.

At most, the Complaint suggests that the Departing Executives and the Board had different strategies to achieve a shared goal of creating a cross-platform measurement currency.  However, nothing in the Complaint indicates that the Company ever abandoned its strategy of establishing a cross-platform measurement currency throughout the Class Period, even if the prioritization of means to achieve that goal may have shifted over time.  (*See, e.g.,* Compl. ¶¶ 44, 45).[10]  Indeed, the Complaint acknowledges that cross-platform measurement was and remains Comscore's business.  (*See, e.g., id.* at ¶ 44 ("We do not expect these [officer resignation] changes to impact the work that we're doing for our clients or our strategy to be the trusted currency for planning, transacting, and evaluating media across platforms.  We continue to be uniquely positioned to become the modern currency for the cross-platform era, and the changes we've made today are directly in line with that vision."); Thau Decl., Ex. 4 (Comscore, Inc., Quarterly Report at 32 (Form 10-Q) (August 7, 2019)) (stating that Comscore "measures consumer audiences and advertising across media platforms" and its "combination of data and methods helps companies across the media ecosystem better understand and monetize audiences")).  Plaintiff does not argue otherwise.[11]

---

[10]   Plaintiff quotes a Comscore spokesperson who "confirmed the disagreement" between the Departing Executives and the Board, stating that Wiener "disagreed with the company regarding the execution of the strategy."  (Pl. Opp. 4 (quoting Compl. ¶ 44)).  Accordingly, while Plaintiff's allegations support the inference that the Board and Departing Executives may have disagreed on the best strategy for achieving the goal of creating a cross-platform measurement currency, they simultaneously confirm that the parties agreed on the goal.

[11]   Plaintiff cites a former Company employee's statement that, with respect to the cross-platform measurement currency strategy, "we never got it done."  (Pl. Opp. 11 n.5).

For all of these reasons, Plaintiff has not pleaded an actionable misstatement or omission.  Accordingly, the Court does not reach the Defendants' arguments that: (i) the statements are non-actionable as opinion; and (ii) the statements are non-actionable because they are subject to the PSLRA's safe harbor for forward-looking statements.  (*See* Def. Br. 13-17).

### b.    Plaintiff Has Failed to Plead Scienter

The Court dismisses Plaintiff's Complaint for the additional reason that it fails to plead scienter.  As explained above, a strong inference of scienter can be pleaded in two ways: "[i] showing that the defendants had both motive and opportunity to commit the fraud or [ii] [facts] constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI Commc'ns, Inc.*, 493 F.3d at 99 (citations omitted).  Here Plaintiff relies solely on Defendants' alleged conscious misbehavior or recklessness.  (*See* Pl. Opp. 19-20).  A showing of conscious misbehavior or recklessness generally requires demonstrating that defendants: "[i] benefitted in a concrete and personal way from the purported fraud; [ii] engaged in deliberately illegal behavior; [iii] knew facts or had access to information suggesting that their public statements were not accurate; or [iv] failed to check information they had a duty to monitor."  *ECA*, 553 F.3d at 199.  Conscious recklessness is "a state of mind approximating actual intent, and not merely a heightened form of negligence."  *Stratte-McClure*, 776 F.3d at 106.

---

That Comscore may never have accomplished its goal does not, however, render any of the Alleged Misstatements regarding the goal false or misleading.

Plaintiff relies on the "core operations" doctrine, arguing that developing a cross-platform measurement currency was at the core of Comscore's business.  (Pl. Opp. 19-20).  Under the "core operations" theory, a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue."  *Oklahoma Firefighters Pension & Ret. Sys.* v. *Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019).  However, "the PSLRA, which was enacted in 1995, has significantly limited the salience of the core operations doctrine."  *In re Rockwell Med., Inc. Sec. Litig.*, No. 16 Civ. 1691 (RJS), 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018).  Indeed, "the Second Circuit has [] questioned whether the core operation doctrine has survived the enactment of the PSLRA."  *Id.* (citing *Frederick* v. *Mechel OAO*, 475 F. App'x 353, 356 (2d Cir. 2012) (summary order)).  At best, given these developments in the law, allegations regarding core operations *may* factor into a court's holistic assessment of scienter allegations, but are not independently sufficient to raise a strong inference of scienter.  *Id.*; *Lexmark Int'l*, 367 F. Supp. 3d at 37.

Here, the Complaint pleads no facts suggesting that Defendants had any knowledge of information contradicting the Alleged Misstatements, let alone independent allegations of scienter.  The Complaint's allegations regarding scienter are contained entirely in a single, cursory paragraph in the "Scienter Allegations" section:

> As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the

> Company were materially false and/or misleading;
> knew that such statements or documents would be
> issued or disseminated to the investing public; and
> knowingly and substantially participated or acquiesced
> in the issuance or dissemination of such statements or
> documents as primary violations of the federal
> securities laws. *As set forth elsewhere herein in detail*,
> the Individual Defendants, by virtue of their receipt of
> information reflecting the true facts regarding
> Comscore, their control over, and/or receipt and/or
> modification of Comscore's allegedly materially
> misleading misstatements and/or their associations
> with the Company which made them privy to
> confidential proprietary information concerning
> Comscore, participated in the fraudulent scheme
> alleged herein.

(Compl. ¶ 77 (emphasis added)).

The "detail" promised in paragraph 77 is nowhere found in the rest of the

Complaint.  The Complaint fails to allege an intent to mislead investors.  It

does not suggest that Defendants personally benefitted from any alleged fraud.

Nor does the Complaint allege any "hallmarks" of deliberately illegal behavior —

e.g., "sham transactions" or "undisclosed payments."  *In re Marsh & McLennan*

*Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 477 (S.D.N.Y. 2006).  In point of fact,

the Complaint lacks any facts suggesting that the Individual Defendants had

any knowledge of any information contradictory to that contained in the

Alleged Misstatements.  *See Dynex*, 531 F.3d at 196 ("[W]here plaintiffs

contend defendants had access to contrary facts, they must specifically identify

the reports or statements containing this information." (quoting *Novak*, 216

F.3d at 309)); *Tongue* v. *Sanofi*, 816 F.3d 199, 208 (2d Cir. 2016) ("Plaintiffs []

failed to allege any facts suggesting that Defendants did not genuinely believe what they were saying at the time they said it.").

And while a plaintiff "need not always identify the individuals responsible for the fraudulent statement … [it is only] [i]n exceedingly rare circumstances [that] a statement may be so dramatic that collective corporate scienter may be inferred." *Jackson*, 2020 WL 2755690, at *4 (holding that "naked assertion" that "senior officers must have known that challenged statements were false" because subject of statements "was of such core importance" to the corporate defendants was "plainly insufficient to raise a strong inference of collective corporate scienter"). The anodyne statements here certainly do not fall into the category of those so dramatic that scienter may be imputed to the Company. *See Kalnit*, 264 F.3d at 144 (holding that where a complaint "does not present facts indicating a clear duty to disclose" it does not establish "strong evidence of conscious misbehavior or recklessness").

In his opposition brief, Plaintiff argues that he has pleaded scienter based on (i) confidential witness statements; and (ii) the departure of certain employees and one Board member. (*See* Pl. Opp. 21-22). But the confidential witness merely provided information that: (i) confirmed that the Board sought to implement a strategy that differed from the one championed by Wiener and Hofstetter, but that was designed to achieve the same goal; (ii) Comscore had difficulty working with third parties, such as Hulu, to implement the cross-platform measurement currency; and (iii) Comscore faced issues with data rights that needed to be addressed on a client-by-client basis. (Compl. ¶ 46).

33

Such information, taken individually or collectively, does not give rise to an inference that Defendants intentionally or recklessly misled investors regarding the Company's efforts to achieve its goal.  The allegations do not suggest, let alone plead with particularity, that any Defendant had knowledge of facts contradicting the Alleged Misstatements, and therefore the confidential witnesses' statements are insufficient to plead an intent to defraud.

Further, Plaintiff's allegations regarding the employee departures do not raise an inference of scienter.  Plaintiff does not allege that the resignations were unusual or suspicious, and there is no independent evidence corroborating that the employees had a culpable state of mind.  *See Schiro* v. *Cemex, S.A.B. De C.V.*, 396 F. Supp. 3d 283, 303 (S.D.N.Y. 2019); *Sjunde,* 2019 WL 4094559, at *12 (holding that resignations of GE executives, among other allegations, did not support strong inference of scienter).  The resignations merely support the inference that certain managerial employees disagreed with the Board regarding the strategy the Company should implement going forward.

The most cogent inference from the Complaint's allegations, taken holistically, is that the Departing Executives and the Board had an internal disagreement about the best way of achieving their shared goal of establishing a cross-platform measurement currency, and that the Departing Executives and other employees resigned from the Company because of such disagreement.  Put simply, the Court finds that any reasonable person would

34

deem the inference of scienter to be far less compelling than an inference of, at most, non-actionable mismanagement or negligence on the part of Defendants.

### 3. Plaintiff Has Failed to State a Claim for Control Person Liability Under Section 20(a)

A *prima facie* case of control person liability under Section 20(a) of the Exchange Act requires "[i] a primary violation by the controlled person; [ii] control of the primary violator by the defendant; and [iii] that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc.*, 493 F.3d at 108. Plaintiff has failed to allege a primary violation. Consequently he has failed to make a *prima facie* showing under Section 20(a).

### B. The Court Grants Plaintiff's Request for Leave to Amend

Plaintiff requests leave to amend the Complaint and file a Second Amended Complaint rectifying its deficiencies. (Pl. Opp. 23-24). Rule 15(a)(2) instructs courts to freely give leave to amend "when justice so requires." *McCarthy* v. *Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007); *see also* Fed. R. Civ. P. 15(a). "This permissive standard is consistent with [the Second Circuit's] 'strong preference for resolving disputes on the merits.'" *Williams* v. *Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (per curiam) (quoting *New York* v. *Green*, 420 F.3d 99, 104 (2d Cir. 2005)). And where, as here, a securities fraud case "combines a complex commercial reality with a long, multi-prong complaint," the Circuit has encouraged courts to grant leave to amend, because "pleading defects may not only be latent, and easily missed or misperceived without full briefing and judicial resolution; they may also be

borderline, and hence subject to reasonable dispute." *Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Sec., LLC*, 797 F.3d 160, 191 (2d Cir. 2015).

The Court has not granted Plaintiff leave to amend to correct pleading deficiencies on any prior occasion, and cannot find that amendment would be futile or unduly prejudicial.  It cautions Plaintiff, however, to focus on the allegations related to the Class Period.  As written, the first quarter of Plaintiff's Complaint is devoted to "Background," which turns out to be verbatim copying of chunks of Comscore's September 24, 2019 settlement with the SEC in another matter.  These allegations are unrelated to the Alleged Misstatements and Plaintiff is instructed to think carefully about including such lengthy "well-poisoning" information in any further amended complaint.  The Court also expects that Plaintiff will consider carefully the Court's observations and admonitions in this Opinion.

## CONCLUSION

For the reasons explained above, Defendants' motion to dismiss is GRANTED.  Plaintiff's Complaint is dismissed.

Plaintiff is hereby ORDERED to notify the Court, on or before **July 24, 2020**, regarding whether he will file a second amended complaint.

The Clerk of Court is directed to terminate the motion at docket entry 30.

SO ORDERED.

Dated:      June 24, 2020
            New York, New York

_____
      KATHERINE POLK FAILLA
      United States District Judge

36